740 So.2d 940 (1999)
Jon Kurrie PETERSON, Appellant,
v.
STATE of Mississippi, Appellee.
No. 96-KA-00941 COA.
Court of Appeals of Mississippi.
March 9, 1999.
Rehearing Denied June 8, 1999.
Certiorari Denied September 2, 1999.
*941 Bobby Joe Randall, Gulfport, Attorney for Appellant.
Office of the Attorney General by Dewitt T. Allred III, Attorney for Appellee.
BEFORE McMILLIN, P.J., COLEMAN, AND SOUTHWICK, JJ.
COLEMAN, J., for the Court:
¶ 1. A grand jury in the First Judicial District of Harrison County returned a three-count indictment against the appellant, Jon Kurrie Peterson and/or Francis Rudolph Marin, Jr. Count I charged Peterson with the murder of Joseph Darius *942 Saucier; count II charged both Peterson and Marin with third-degree arson for the burning of a 1986 Ford Ranger pickup which belonged to Wendy Thomas; and count III charged Marin with having been an accessory after the fact to Peterson's murder of Saucier. The day before Peterson's trial began, Marin pleaded guilty to both of the crimes for which he had been indicted, and the trial court suspended his sentence and placed him on probation. After Peterson's trial, which lasted four days, the jury returned verdicts of guilty of both murder and third-degree arson. The trial court sentenced Peterson to serve life imprisonment for murder and to serve three years for third-degree arson "to run consecutively with each other in the custody of the Mississippi Department of Corrections." Peterson appeals from the trial court's final judgment to present the following six issues for this court's review and resolution:
1. IMPROPER VOIR DIRE BY STATE
2. THE STATE SYSTEMATICALLY ELIMINATED ALL BLACK JURORS
3. THE COURT ERRED IN NOT GRANTING APPELLANT'S MOTION FOR CONTINUANCE BASED ON PREJUDICIAL IMPACT OF RADIO, NEWSPAPER AND OTHER NEWS OF THE PLEA OF MARIN ONE DAY BEFORE THIS TRIAL.
4. COMPLETE DISPARITY IN SENTENCES OF CO-DEFENDANTS
5. DUTY OF TRIAL COURT TO INSERT MANSLAUGHTER AND SELF-DEFENSE JURY INSTRUCTIONS
6. DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
¶ 2. We quote these issues verbatim from the statement of issues found in Peterson's brief as required by Rule 28(a)(3) of the Mississippi Rule of Appellate Procedure, which requires that "[a] statement shall identify the issues presented for review." M.R.A.P. 28(a)(3). We resolve all six of these issues adversely to Peterson and affirm the final judgment of the Circuit Court of the First Judicial District of Harrison County.

I. FACTS
¶ 3. None of Peterson's issues require an elaborate recitation of the facts in this case because all but one of his issues relate to asserted procedural errors committed by the trial court during his trial. At approximately 6:35 p. m. on Saturday, August 5, 1995, Wendy Thomas reported to Lieutenant Coleman and Deputy Bradley with the Harrison County Sheriff's Department that she had not seen Darius Saucier, with whom she had been living, since approximately 7:00 o'clock the night before when Saucier left their home to go to the residence of Jon and Debbie Peterson, the parents of Kurrie Peterson. According to Wendy Thomas, Saucier had taken a VCR with him so that Josh Peterson, Kurrie Peterson's younger brother, who lived with his parents, might repair it. Kurrie Peterson had returned to live in his parents' home about two weeks previously. About one week after Kurrie Peterson returned to his parents' home, Vanessa McClendon, his fiancee, moved into the Petersons' home to be with Kurrie Peterson.
¶ 4. Earlier that same Saturday afternoon, August 5, at approximately 4:00 o'clock, Patrick Peterson, no relation to Kurrie Peterson, discovered an incinerated pickup, the tires of which were still smoldering, on land located in northwest Harrison County. The land belonged to the Oil Well Hunting Club, of which Patrick Peterson was a member. Patrick Peterson wrote down the license plate number on the pickup and reported his discovery to the Harrison County Sheriffs Department later that evening. Andy Calvanese, a criminal investigator with the Harrison County Sheriffs Department for the previous *943 eight years, drove to the scene of the apparent arson of the truck.
¶ 5. After Officer Calvanese determined that the truck belonged to Wendy Thomas and that it was this truck in which Darius Saucier had left to drive to the Petersons' home the night before, Officer Calvanese interviewed Saucier's brother. Then, Officer Calvanese interviewed Wendy Thomas and her sister Robin Barnett. Darius Saucier had accompanied Robin Barnett when she drove her father to the airport at New Orleans on Friday morning, August 4. After Officer Calvanese interviewed Wendy Thomas and Robin Barnett, he learned that Saucier had gone to the Petersons' home, which was located in northwest Harrison County.
¶ 6. At approximately 5:40 o'clock on Sunday morning, August 6, Officer Calvanese traveled to the Petersons' home, where he interviewed Kurrie Peterson. During his interview, Kurrie Peterson told Officer Calvanese that Saucier had loaned him $1,200, but that he had paid Saucier $800 on the previous Friday night after Saucier had arrived at the Petersons' home.
¶ 7. Officer Calvanese left the Petersons' home and drove to the home of Rudy Marin, where he arrived at about 6:15 o'clock that morning. When Officer Calvanese drove onto the driveway leading to Rudy Marin's home, he first observed a black motorcycle equipped with tires that had treads similar to tracks left by a motorcycle in the area where Patrick Peterson had discovered the incinerated pickup. Officer Calvanese interviewed Marin after he had advised him of his Miranda rights, the result of which was Marin's arrest by Officer Calvanese on the charge of arson of the pickup which belonged to Wendy Thomas. After Officer Calvanese arrested Marin, he placed Marin in a police car and drove to the site of a shallow grave to which Marin had directed him. Officer Calvanese and other deputies recovered Darius Saucier's body from the grave.
¶ 8. Later, a pathologist, Dr. Paul McGarry, conducted a post mortem examination of Saucier's corpse. He found "five gunshot wounds that involved the head, the neck, the chest, right arm, and the abdomen." Dr. McGarry opined that either of two wounds was fatal. The first was caused by a .25 caliber slug that entered the right side of Saucier's head above and behind his right ear, penetrated through Saucier's brain, and lodged under the skin on Saucier's left temple. The second fatal wound was caused by a .38 caliber slug that went through Saucier's "right arm, behind the bone of the arm and went into the chest passing through both lungs and the heart." Evidence adduced during the trial established that Saucier had a .38 caliber revolver and that Kurrie Peterson had a .25 caliber automatic pistol the night that Saucier was killed.

II. TRIAL
¶ 9. During this four-day trial, the State called twelve witnesses, and Peterson called nine witnesses. Because none of Peterson's six issues relate to the admission, sufficiency, or weight of the evidence, we forgo a detailed recitation of the testimony and evidence which both the State and Peterson adduced. The State's primary witness was Vanessa McClendon, who testified that Kurrie Peterson had told her earlier that day, Friday, August 4 that he intended to kill Saucier, who was his second cousin. She testified that after Saucier had brought the VCR to the Petersons' home for Josh Peterson to repair and had visited for some time, Kurrie Peterson, who did not own a vehicle, invited Saucier to take a ride with him in Wendy Thomas's pickup truck.
¶ 10. Peterson and Saucier left in the pickup with Saucier driving. Hardly had they left, when they returned only long enough for Peterson to exit the truck, run into his parents' home, exit equally quickly, get back into the pickup, and again leave with Saucier at the wheel. Ms. McClendon testified that within a very *944 brief time after Saucier and Peterson left the second time, she heard four or five gunshots. The pickup returned within minutes after she heard the gunshots, only this time Peterson was driving it. According to McClendon, Peterson instructed her to get into the bed of the pickup while Peterson got a shovel from a nearby shed.
¶ 11. With McClendon squatting in the rear of the bed of the pickup, Peterson drove two or three miles from his parents' home into some woods, where he parked the truck. Not until then had McClendon seen Saucier's body on the passenger's side with its knees resting on the floorboard and its head against the passenger's door. Saucier weighed well over two hundred pounds, so Peterson had some difficulty removing the body from the passenger's side of the pickup. McClendon then described Peterson's dragging Saucier's body farther into the woods, where he found a "soft spot" and there dug a shallow grave. Peterson covered Saucier's remains, and McClendon gathered pine straw with which to cover it. Once they had finished their grisly task, Peterson drove the pickup with McClendon as a passenger back to his parents' home, where he rinsed his arms with water from an outdoor hose, and then went to bed with McClendon on a pallet which they had made on the floor of the Petersons' den. The State had granted Vanessa McClendon complete immunity from prosecution for her role in the events which occurred on Friday evening, August 4, 1995. Rudy Marin testified for the State about his role in helping Kurrie Peterson burn Wendy Thomas's pickup the following Saturday afternoon and about Peterson's admission that he had killed Saucier.
¶ 12. Kurrie Peterson called both his father, Jon Peterson, and his mother, Debbie Peterson, who testified that their son had never left their home the night that Saucier was killed. Peterson's counsel also elicited evidence about McClendon's treatment for depression and related illnesses for approximately thirty days in 1991 when she was only fourteen or fifteen years old. The thrust of Peterson's defense was that either McClendon or Rudy Marin had killed Saucier and had conspired to frame Peterson. Several side issues evolved during the trial such as a dispute about the time the fatal shots were heard and about whether Kurrie Peterson burned his Sperry topsider shoes when he burned the shirt and pants he was wearing when he killed Saucier. Peterson's mother had produced a pair of Sperry topsider shoes which she had found in her son's closet several days after Kurrie had been arrested. Nevertheless, the jury convicted Peterson of both the murder of Saucier and the third-degree arson of Wendy Thomas's pickup.
¶ 13. After the trial court denied Peterson's motion for new trial, Peterson filed a motion pro se for leave of court to appeal in forma pauperis. Peterson included in this motion his request "to have a court appointed attorney designated to him to aid him in the perfection and processing of his appeal." The trial court entered an order granting Peterson "leave of court to proceed in forma pauperis" and appointing a member of the Gulfport bar other than his trial counsel to represent him in his appeal.

III. REVIEW, ANALYSIS, AND RESOLUTION OF THE ISSUES

A. Peterson's first issue: Improper voir dire by State
¶ 14. Peterson's argument on his first issue rests on Rule 3.05 of the Uniform Circuit and County Court Rules, which provides in part that "the attorney will question the entire venire only on matters not inquired into by the court" and that "[i]ndividual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court." He complains that "[i]n effect, the State was afforded two (2) unauthorized opening statements that *945 were repetitive and apparently asked no new questions to the jury in violation of [this] Rule." He next complains that "when defense counsel began in a like manner, the Court sustained the State's objection with instructions to defense counsel, `Repetitive, move on.'" Peterson contends that the trial court's "comment sent the wrong message to the jury that the State had some rights and privileges which the defendant did not have." Peterson offers no specific example of any "unauthorized" or "repetitive" voir dire, but, instead, cites pages 49-60 of the trial transcript, which includes a portion of the prosecutor's voir dire, for this Court to review.
¶ 15. The State counters with the assertion that because Peterson's trial counsel never objected to the State's conduct of voir dire, this Court may decline to review Peterson's first issue. See Box v. State, 610 So.2d 1148, 1154 (Miss.1992) (citing with approval Handley v. State, 574 So.2d 671 (Miss.1990) and explaining that "a contemporaneous objection to the allegedly prejudicial remarks [made during closing argument] is required"). In its own review of the record in the case sub judice, this Court has found that Peterson's trial counsel omitted this issue from the motion for new trial which he timely filed after the trial court had entered its final judgment. See Ahmad v. State, 603 So.2d 843, 846-47 (Miss.1992) (explaining that "[i]n Mississippi, the broad rule governing preservation for review provides that if an appellant raises for review an issue not raised in the pleadings, transcript, or rulings, the appellant must have preserved the issue by raising it in a motion for new trial.")
¶ 16. Peterson's failure to object to the State's conduct of its voir dire of the venirepersons as recorded on pages 49 through 60 of the trial transcript and his failure to include this issue in his motion for new trial more than justifies our summary resolution of this issue adversely to him. However, this Court has perused the offending twelve pages, pursuant to which it has found that while the last eight pages constitute an apparent monologue by the assistant district attorney, questions to the jury are embedded within it. The venirepersons made no response to any of those questions, but their failure to respond to any of these embedded questions does not connote error.
¶ 17. Throughout the thirty-two pages of the trial transcript used to record Peterson's defense counsel's voir dire of the venirepersons, the State's only objection occurred almost immediately before Peterson's counsel had concluded his voir dire. Defense counsel's statement that "[t]his man's future over here [Peterson] depends on your [serious attention]," brought the State's objection on the ground that his statement went "into sentencing matters." The judge responded, "This is also repetitive. Let's move on...." Peterson cites no authority for his assertion that the judge's "comment sent the wrong message to the jury...." Although we elected to put aside the procedural bar, our review of this portion of both the State's and Peterson's voir dire finds no error. This Court thus resolves Peterson's first issue adversely to him.

B. Peterson's second issue: The State systematically eliminated all black jurors.
¶ 18. As with his first issue, Peterson omitted his second issue from his motion for new trial, but because Peterson's counsel alluded to the fact that he was "losing all my black jurors," during the conference among the judge, prosecutors, and defense counsel to select the members of the jury, this Court reviews this issue.

1. Standard of Review

¶ 19. "[A] trial judge's factual finding relative to a prosecutor's use of peremptory challenges on minority persons are to be accorded great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence." Lockett *946 v. State, 517 So.2d 1346, 1350 (Miss. 1987). The three elements necessary to show discrimination in exercising peremptory challenges were initially stated in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Those elements include (1) a showing that the defendant is "a member of a cognizable racial group;" (2) the entitlement of the defendant to rely on the fact that peremptory challenges permit "those to discriminate who are of a mind to discriminate;" and (3) that "these facts and any other relevant circumstances raise an inference that the [State] used that practice to exclude the veniremen from the petit jury on account of their race." Batson, 476 U.S. at 96, 106 S.Ct. 1712. Later, the opportunity to cite racial discrimination in exercising peremptory challenges was extended to cases where the excluded members of the venire did not share the same race as the criminal defendant. Powers v. Ohio, 499 U.S. 400, 416, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Thus, Powers eliminated the first element which Batson created.

2. Analysis

¶ 20. Peterson asserts in his brief that "defense counsel was under a duty to make sure that the record included names, race and gender of jurors excused peremptorily by the State (quoting Triplett v. State, 666 So.2d 1356 (Miss.1995)," The record includes the following information about certain of the venirepersons which the judge made before he had ruled on both the State's and Peterson's challenges of venirepersons:
For the record, the defendant is a white male, and for the record, on panel number one, Miss Watts is a black female. Panel number two, Miss Spann and Miss Durr are black females. Mr. Graves on panel one was excused by the Court for cause with no objection from either side. He at the bench advised that he previously had been convicted of a felony. Panel three, Miss White and Mr. Evans are black, and I think that's all.
After twelve jurors had been selected and as the selection of the two alternate jurors began, the State exercised a peremptory challenge to a Mr. Evans. Peterson's counsel responded by saying, "I'm losing all my black jurors for some unexplained reason here." Without more and before the State could respond, the judge asked, "Do you have a Batson challenge as to Evans?" Peterson's counsel replied, "Yes, Sir." The assistant district attorney offered the following race-neutral reason for having exercised his first of two peremptory challenges for proposed alternate jurors on Mr. Evans:
Judge, Mr. Evans didn't respond to any of the questions. In particular, his card notes that he is unemployed, no history of ever having been employed or any family, and he obviously suffers from some disability in that he has no doesn't appear to have any vision in his eye. He appeared to suffer at least some disability in his vision. I don't feel he would be an appropriate juror to hear this case over the course of a week, or at least the next three or four days, which I expect this case to take.
The judge found the assistant district attorney's explanation of his use of a peremptory challenge on Mr. Evans, a black male, to be "a sufficiently race-neutral reason."
¶ 21. In Appendix I to Lockett v. State, 517 So.2d 1346, 1356 (Miss.1987), the Mississippi Supreme Court listed cases from other jurisdictions in which the courts had upheld certain racially neutral reasons "to provide some guidance to our trial courts." Id. at 1353. Among those racially neutral reasons which courts in other jurisdictions had upheld were employment history and inattentiveness to the proceedings. These two reasons are strikingly similar to the reasons which the assistant district attorney gave for his peremptory challenge of venireperson Evans. Peterson's counsel proposed no rebuttal to the racially neutral reasons offered by the State; thus, this Court applies its previously quoted standard *947 of review to affirm the judge's finding that the State's reason for its peremptory challenge of Evans was "sufficiently race neutral." We affirm it because we must "accord[] great deference" to the trial judge's factual finding and because the record does not discloseand Peterson's trial counsel did not challengethat the judge's finding "appear[ed] clearly erroneous or against the overwhelming weight of the evidence." See Lockett, 517 So.2d at 1350.

C. Peterson's third issue: The trial court erred in not granting appellant's motion for continuance based on prejudicial impact of radio, newspaper and other news of the plea of Marin one day before this trial.

1. Factual basis for the issue
¶ 22. Peterson's trial began on Tuesday morning, April 16, 1996. The front page of Section B of the issue of the "The Sun Herald" dated that same date, April 16, carried a news article headlined, "Trial comes between 2 old friends." The article related that Francis Marin had pleaded guilty in the Harrison County Circuit Court on the day before to the crimes of "third-degree arson and accessory after the fact to the murder of Joseph Saucier." It then explained that Marin's pleas of guilty were "part of an arrangement with prosecutors under which Marin [would] testify on the state's [sic] behalf during Peterson's murder trial, scheduled to begin with jury selection today at 9:30 a. m. in Circuit Court." The article stated, "Marin said Monday that Peterson admitted to pulling the trigger."
The article further explained that "Peterson, 23, is accused of shooting Saucier, also 23, to death over some money Saucier apparently owed him."

2. Procedure in the trial court
¶ 23. When the judge called the case for trial the morning that this article appeared in the newspaper and asked Peterson's counsel if he was ready for trial, Peterson's counsel replied, "Subject to what we talked about in chambers, we are ready." What the judge and defense counsel had discussed in chambers was a motion to continue the trial because of the appearance of this article in the newspaper. After the jury had been selected and sworn to try the issues in this case, Peterson's counsel moved for a continuance "when we can get a jury that has not seen such an article as this on the very morning of the trial['s] beginning." After the judge had heard argument by both Peterson's counsel and the State on Peterson's motion for continuance because of the appearance of this article, he denied the motion. Among the judge's findings on which he based his denial of Peterson's motion for continuance were the following:
First, the Court has reviewed the content of the article, and if these matters are such that Mr. Marin would testify about during the trial, all of these matters appear to the Court ... that they are all probably relevant and admissible for him [Marin] to testify about.
. . . .
So I don't find that there is anything in the article that is offensive or prejudicial that would require the Court to strike the venire.
Next, the judge reviewed his voir dire of the panels of venirepersons, which included his inquiry "as to which members had read or seen something about this case from any other source, and the notes that the Court took." Juror by juror, the judge recited the fate of each of the venirepersons who had responded to the judge's questions about what they had read that morning in the newspaper. The judge foundand the record supports his finding that of all the venirepersons who answered that they had heard something about the case, only one, a Miss Canter, had been selected to serve on the trial jury. Miss Canter had informed the judge that she had heard about the case "on the radio." She had not read the newspaper *948 article that had been published that morning. Both the State and Peterson accepted Miss Canter. The judge further found that "the defense still had three strikes remaining, that the defense only used nine strikes." Of the venirepersons who were considered for service as alternates, only one, a Miss Hanby, had responded affirmatively to be judge's questions about the newspaper article, and Peterson's counsel had peremptorily challenged her. The judge denied Peterson's counsel's motion for a continuance based on these findings.

3. Peterson's and the State's arguments
¶ 24. Peterson contends that "[t]he majority of this jury had been already influenced by the news, and even though they indicated they could judge the evidence, prejudicial defective human virtues was [sic] deeply implanted." Thus, Peterson "complains that this jury was tainted from the beginning, and this jury venire should have been struck." He asserts that "[t]here are no clear guidelines as to what specifically constitutes prejudice...." Peterson then concludes that he "was prejudiced" and that "[t]his [was] plain error...." Peterson cites no authority whatsoever to support his argument. His failure to cite authority would ordinarily be sufficient reason to proceed no further with our resolution of his third issue. See Thibodeaux v. State, 652 So.2d 153, 155 (Miss.1995) (agreeing "with the State's suggestion that those issues unsupported and not argued are abandoned and need not be considered) (citing Pate v. State, 419 So.2d 1324, 1325-26 (Miss.1982)).
¶ 25. The State does not rest on the apparent procedural bar which Peterson's counsel's failure to provide authority creates. Instead, it cites Hoops v. State, 681 So.2d 521, 526 (Miss.1996), in which the appellant claimed that he had moved the trial court "to quash the venire due to a series of newspaper articles that appeared in ... a local newspaper, during the week preceding the trial." As did Peterson in the case sub judice, Hoops "cite[d] no legal authority to support [his] argument." Hoops, 681 So.2d at 526. Nevertheless, the supreme court reviewed the issue. The supreme court noted that "Hoops did not provide the trial court with any statement and affidavits swearing that he could not receive a fair and impartial trial." Id. at 526-27. The supreme court then concluded: "Since Hoops failed to comply with the requirements of Miss.Code Ann. § 99-15-35 and to cite to any legal authority to show why his argument merits relief, the argument must fail." Id. at 527. Section 99-15-35 establishes the procedural requisites and criteria for obtaining a change of venue.[1]

4. Resolution of the issue
¶ 26. The record reflects that during his voir dire of the members of the venire panels, the judge inquired, "[D]o any of you have any knowledge or have you heard about the allegations of this case previously from any source whatsoever?" Eleven venirepersons responded affirmatively. Eight had read something about the case in the newspaper, although not necessarily the article which had been published that morning; two had heard the case discussed but had read nothing in the newspaper about it; and one venireperson, identified as "Miss Cantor," had heard about it on the radio.
¶ 27. After the judge had questioned all eleven venirepersons separately, he then *949 asked, "[S]o all of you are telling me that whatever you have heard, you can lay that aside and decide this case strictly upon what you hear from the witness stand, along with any exhibits, follow the instructions of law; is that correct?" All eleven venirepersons, including Miss Cantor, individually replied, "Yes, sir." We have already noted that of the eleven venirepersons who had responded affirmatively to the judge's inquiry, only one, Miss Cantor, who had heard about the case on the radio, was selected to serve on the jury. Peterson did not attempt to challenge Miss Cantor for cause, and, obviously, he did not challenge her peremptorily, even though the record also reflects that Peterson used only nine of his allotted twelve peremptory challenges.
¶ 28. "[B]ecause the trial judge hears and sees the individual jurors, he is in the better position to evaluate their responses and determine whether or not they should be excluded for cause." Williamson v. State, 512 So.2d 868, 881 (Miss.1987). Thus, "[T]he determination of whether a juror is fair and impartial is a judicial question, and will not be set aside unless such determination is clearly wrong." Taylor v. State, 672 So.2d 1246, 1264 (Miss.1996). The trial judge did not err when he denied Peterson's motion for a continuance, which Peterson based on the publication that morning of the article about Marin's guilty plea which had occurred the day before Peterson's trial began. This is especially true because the record reflects that Peterson accepted without challenge Miss Cantor, the only juror of the eleven venirepersons whom the judge had questioned about her prior knowledge of the case. We affirm the trial court's denial of Peterson's motion for continuance.

D. Peterson's fourth issue: Complete disparity in sentences of co-defendants
¶ 29. Peterson's argument on his fourth issue is more of a complaint than an argument! He complains that "[t]he co-defendant Marin, as accessory after the fact of murder and third-degree arson, was given a suspended sentence and placed on probation." He next laments that "Vanessa McClendon was given complete immunity...." Peterson cites United States v. Wheeler, 802 F.2d 778, 783 (5th Cir.1986), to support his assertion that "in meeting [sic] out sentences a factor analysis must be used." He then "assigns as plain error that the Wheeler factors were never considered." However, Peterson never identifies the Wheeler factors, and he fails to explain how the trial court's consideration of the Wheeler factors would have resulted in a lesser sentence for Peterson.[2]
¶ 30. The State counters Peterson's argument by noting correctly that Peterson's counsel "made no objection to his sentence in the trial court, and objections as to sentence cannot be made initially on appeal." The State is correct. See Reed v. State, 536 So.2d 1336, 1339 (Miss.1988) (noting that because "the record reflects appellant did not present to the trial court the proposition that his sentence was unconstitutional,... he may not assert that allegation on appeal, and it is procedurally barred") (citations omitted). As for Peterson's lament that Vanessa McClendon was granted complete immunity from prosecution by the State in return for her testimony against Peterson, the State cites Clemons v. State, 535 So.2d 1354, 1358 (Miss. 1988), in which the Mississippi Supreme Court opined:
We hold prosecutorial discretion was not abused because Pittman, who did not *950 fire the fatal shot, was permitted to plead guilty to manslaughter, while Culberson, the one who fired the fatal shot, was given the death penalty.
¶ 31. Regardless of the procedural bar, this Court notes that for the conviction of murder, Section 97-3-21 of the Mississippi Code requires that "[e]very person who shall be convicted of murder shall be sentenced by the Court to imprisonment for life in the State Penitentiary." Miss.Code Ann. § 97-3-21 (Rev.1994). Thus, the trial court had no discretion in its sentence "to serve life imprisonment ... in the custody of the Mississippi Department of Corrections." While the trial court sentenced Peterson to serve three years "in the custody of the Mississippi Department of Corrections," the sentence was within a statutory limit established by Section 97-17-7 of the Mississippi Code.[3] In Hewlett v. State, 607 So.2d 1097, 1106-7 (Miss.1992), the supreme court affirmed the appellant's sentence to serve "three consecutive twenty (20) year sentences for a total of sixty (60) years" regardless of appellant's argument that his "sentence violate[d] his Eighth Amendment rights." The supreme court explained that "when the trial judge imposes a sentence within the prescribed limits of a statute, it will generally be upheld and not regarded as cruel and unusual." Id.
¶ 32. It should also be noted that count II of the indictment for third-degree arson was the only charge for which both Peterson and Marin were charged. Whereas Peterson was also indicted for the murder of Darius Saucier in count I of the indictment, Marin was indicted in count III for having been an accessory after the fact to Peterson's murder of Saucier. Section 97-1-5 of the Mississippi Code, which creates the felony of "accessories after the fact," imposes a maximum sentence of five years imprisonment. Miss.Code Ann. § 97-1-5 (Rev.1994). It was impossible for Peterson and Marin to receive even similar sentences for their crimes which related to Saucier's homicide. While the procedural bar remains a sufficient reason to resolve Peterson's fourth issue adversely to him, precedent relevant to this issue supports our affirming the trial court's sentences which it imposed on Peterson.

E. Peterson's fifth issue: Duty of trial court to insert manslaughter and self-defense jury instructions
¶ 33. In his brief, Pearson argues:
Appellant complains that the trial court has a duty to insert a jury instruction on both manslaughter and self-defense, or either, even when it is not requested by the defense, despite the fact that defendant's trial evidence was weak, disputed and contradicted by the co-defendant's statements. The failure to have provided said instructions to the jury shifts the burden of proof, improperly, upon the defendant to prove that the alleged crime was something other or less than murder.
Peterson cites the dissenting opinion written by Justice McRae in Triplett v. State, 666 So.2d 1356, 1365 (Miss.1995), which includes the following quotation from Duvall v. State 634 So.2d 524, 526 (Miss. 1994): "A circuit judge has a responsibility to see that the jury is properly instructed." Triplett, 666 So.2d at 1365 (McRae, J., dissenting) (quoting Duvall, 634 So.2d at 526). Regardless, the Mississippi Supreme Court explained in Conner v. State, 632 So.2d 1239, 1254 (Miss.1993): "The case law does not impose upon a trial court a duty to instruct the jury sua sponte, nor is a court required to suggest instructions *951 in addition to those which the parties tender."
¶ 34. The record reflects that Peterson's defense was simply that he did not kill Saucier but that either Vanessa McClendon or Rudy Marin did. The testimony of Peterson's witnesses was consistent with that defense. For example, both of Peterson's parents testified that their son remained at home throughout the late night and early morning hours of August 4, 1995. Two other witnesses testified that they heard several gunshots at a time earlier than the State's witnesses claimed Saucier's murder happened. Thus, Peterson's counsel's decision not to request either a manslaughter or a self-defense instruction seems to be consistent with Peterson's defense.
¶ 35. Because Peterson requested neither a manslaughter nor a self-defense instruction, he cannot now complain on appeal for the first time that he was entitled to have the jury instructed on either of these two matters. See Griffin v. State, 480 So.2d 1124, 1127 (Miss.1985) (holding that where "appellants never submitted a circumstantial evidence instruction to the court for its consideration," the trial court "cannot be put in error for refusal to instruct the jury where no written request was submitted") (citing Newell v. State, 308 So.2d 71, 78 (Miss.1975)). Thus, we resolve Peterson's fifth issue adversely to him by declining to place the trial court in error on an issue which Peterson's counsel never presented to it in the first place.

F. Peterson's sixth issue: Defendant was denied effective assistance of counsel.
¶ 36. This Court quotes in full Peterson's argument on his sixth and last issue:
This appellant was prejudiced and did not receive a fair trial. In Littlejohn v. State of Mississippi, this court stated: "An accused is entitled to a reasonable defense in Court with the effective assistance of counsel." Appellate contends he had neither.
U.S. Const. (Amend.VI).
Peterson cites no examples of alleged ineffective assistance of counsel, and he omits mention of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in which the United States Supreme Court held that the right to representation by counsel guaranteed by the Sixth Amendment included the right to effective representation by counsel. The United States Supreme Court established a two-pronged test to determine whether counsel was effective: "The defendant must demonstrate that his counsel's performance was deficient," and "that the deficiency prejudiced the defense of the case." Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
¶ 37. "[D]efense counsel is presumed competent." Foster v. State, 687 So.2d 1124, 1130 (Miss.1996). Because Peterson "must demonstrate that his counsel's performance was deficient,"yet fails to cite even one example of the alleged ineffective assistance of his trial counsel, we presume that his trial counsel was competent and again resolve Peterson's sixth and final issue against him.

IV. CONCLUSION
¶ 38. The portion of the State's voir dire about which Peterson complained in his first issue was appropriate. The State's one peremptory challenge of Mr. Evans, an African-American male, as an alternate juror, for which the trial court required the State to give a racially neutral reason, did not constitute the systematic elimination of all black jurors as Peterson argues. The trial court's acceptance of the State's racially neutral reason for its peremptory challenge of Mr. Evans does not "appear clearly erroneous or against the overwhelming weight of the evidence." See Lockett, 517 So.2d at 1350. Neither did the trial court err when it denied Peterson's motion for continuance because of the publication of the article about Marin's guilty plea in the issue of the local newspaper *952 on the morning that Peterson's trial began.
¶ 39. Peterson's fourth issue in which he complains about the disparity between his sentences of life imprisonment for his conviction of the murder of Darius Saucier and three years to serve for his conviction of third-degree arson and the suspended sentences and probation imposed upon Rudy Marin for his convictions of third-degree arson and accessory-after-the-fact to the crime of murder are procedurally barred because Peterson rendered no objection to his sentences when the trial judge imposed them on him. Even so, the trial judge had no discretion in imposing a life sentence on Peterson for Saucier's murder.
¶ 40. Because Peterson's counsel did not request instructions on either manslaughter or self-defense, the trial court could not err by not granting such instructions. Moreover, Peterson's request for such instructions would seem inconsistent with his defense that others killed Saucier. Finally, in the absence of Peterson's citing even one example of his trial counsel's ineffective assistance, we presume that his trial counsel was competent. Therefore, this Court affirms the trial court's final judgment of Peterson's convictions of the crimes of murder and of third-degree arson and the sentences which the trial court imposed upon Peterson pursuant to those convictions.
¶ 41. THE JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HARRISON COUNTY OF APPELLANT'S CONVICTION OF MURDER AND THIRD-DEGREE ARSON AND ITS SENTENCES OF APPELLANT TO SERVE LIFE IMPRISONMENT FOR THE CONVICTION OF MURDER AND THREE YEARS FOR THE CONVICTION OF THIRD-DEGREE ARSON IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS TO RUN CONSECUTIVELY WITH EACH OTHER ARE AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO HARRISON COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.
NOTES
[1] Section 99-15-35 provides:

On satisfactory showing, in writing, sworn to by the prisoner, made to the court, or to the judge thereof in vacation, supported by the affidavits of two or more credible persons, that, by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and impartial trial in the county where the offense is charged to have been committed, the circuit court, or the judge thereof in vacation, may change the venue in any criminal case to a convenient county, upon such terms, as to the costs in the case, as may be proper.
Miss.Code Ann. § 99-15-35 (Rev.1994).
[2] The Wheeler factors are the following:

[W]hether the crime was a first offense, whether a defendant was a mastermind or follower, and whether a defendant cooperated with the prosecution...."
Wheeler, 802 F.2d at 783. Contrary to Peterson's reliance on Wheeler to support his argument, the United States Court of Appeals for the Fifth Circuit opined that these factors "can justify giving co-defendants widely different sentences." Id. (emphasis added).
[3] Section 97-17-7 provides in relevant part:

Any person who wilfully and maliciously sets fire to or burns or causes to be burned, or who aids, counsels or procures the burning of any personal property of whatsoever class or character; (such property being of the value of twentyfive dollars and the property of another person), shall be guilty of arson in the third degree and upon conviction thereof, be sentenced to the penitentiary for not less than one nor more than three years.
Miss.Code Ann. § 97-17-7 (Rev.1994).