**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jesus Gabriel GARCIA, Defendant–**
**Appellant.**

No. 99–10001.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 6, 1999.

Filed March 7, 2000.

John C. Lambrose, Assistant Federal Public Defender, Las Vegas, Nevada, for defendant-appellant.

Daniel Bogden, Assistant United States Attorney, Reno, Nevada, for plaintiff-appellee.

Before: SCHROEDER, BEEZER and GRABER, Circuit Judges.

BEEZER, Circuit Judge:

Jesus Gabriel Garcia appeals the district court's denial of his motion to suppress evidence seized from a highway traffic stop and post-arrest statements made to police. Following the denial of his motion, Garcia entered a conditional plea of guilty to charges that he distributed, and conspired to possess with intent to distribute, controlled substances. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I

On November 20, 1997, Nevada Highway Patrol Trooper Chris Greb observed a white Chevy Barretta with out-of-state plates that appeared to have an inoperative right tail light. The vehicle was traveling within the speed limit on a four-lane divided highway. Greb followed the vehicle and determined that the tail light was operative but dim. Greb continued to follow the vehicle and saw it "swerving slightly within its lane, not breaking the lane lines." According to Greb, this swerving indicated "a pattern of an intoxicated driver or tired driver."

Farther down the road, Greb saw the vehicle's left side tires cross into the number one lane and then cross back into the number two lane. A few hundred yards later, the driver activated the left turn signal and moved into the number one lane to pass a semi-truck that was in lane number two. As the vehicle passed the truck, Greb saw it swerve "over the center yellow line into the paved shoulder throwing dirt and debris up." The vehicle then "slightly jerked back into the number one lane" and continued to pass the truck.

Greb decided to pull the vehicle over based on its violation of Nevada Revised Statute 484.305[1] and his observation of "an erratic traffic pattern" that was consistent with an intoxicated or tired

---

1. Nev.Rev.Stat. 484.305 provides in relevant part:

 Whenever any highway has two or more clearly marked lanes for traffic traveling in one direction, vehicles shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has given the appropriate turn signal and ascertained that such movement can be made with safety.

 Although the transcript of the suppression hearing refers to both "44.305" and "434.305," the district court filed an erratum, correcting all references to read "484.305." Garcia strenuously argues that the district court's sua sponte "alteration" of the tran-

 script should be ignored. We recognize the district court's correction and reject Garcia's attempt to exploit the transcription error. Garcia also contends that the statute's "as nearly as practicable" language violates due process because it is unconstitutionally vague. "A statute is void for vagueness when it does not sufficiently identify the conduct that is prohibited." *United States v. Makowski,* 120 F.3d 1078, 1080 (9th Cir.1997) (citations omitted). Because Nevada Revised Statute 484.305 clearly identifies the prohibited conduct, that is, failing to maintain a single travel lane, we hold that Garcia's constitutional challenge lacks merit.

driver. After stopping the vehicle, Greb approached the driver and asked to see his license. The driver produced a Wyoming driver's license identifying him as Jacob Jones. When asked whether he owned the vehicle, Jones stated that it belonged to his girlfriend's mother. Greb then asked Jones to produce the registration documents, to get out, and to move to the rear of the vehicle in order to avoid the nearby traffic. Jones complied, handing Greb a registration form that listed the owner of the vehicle as Ed Clingan of Upton, Wyoming.

After explaining the nature of the traffic violation to Jones, Greb asked him "where he was coming and going from." Jones responded that he and his friend Jessie were traveling from Petaluma, California, where Jones had been to visit his mother, to Laramie, Wyoming, where they were going to see a University of Wyoming football game. Greb then walked to the front of the vehicle to compare the vehicle identification number ("VIN") on the registration with the VIN plate on the left front dashboard. While at the front of the vehicle, Greb asked the passenger the same questions that he had asked Jones. The passenger identified himself as Jessie Garcia and said that he and Jones were coming from California and were headed to Wyoming to attend a technical school.

Upon matching the VIN numbers, Greb returned to his vehicle and radioed the Nevada Highway Patrol ("NHP") to run a records check on Jones' driver's license and a warrants check on him. While waiting for NHP to respond, Greb followed up with Jones regarding the conflicting stories. Jones said that he and Garcia left Petaluma and traveled as far as Reno, Nevada, before he realized that he had forgotten a box in Petaluma. Jones stated that he doubled back to Petaluma, got the box, started the trip again, and stopped in Auburn, California for the night.

Faced with what he felt were now three different stories, Greb again approached Garcia, who remained in the passenger seat, and asked him to detail the trip.

Garcia told Greb that Jones had picked him up in Stockton, California, and that they had spent the night in Auburn. Garcia denied having gone back to Petaluma or having forgotten anything for the trip. Greb then returned to his patrol car to monitor his radio.

At that point, Storey County Deputy Billy Leary observed the traffic stop and pulled over to assist Greb, although not requested to do so. Jones, who was still standing at the rear of the vehicle, asked if he could retrieve a jacket from the vehicle because he was cold. As Jones returned from the vehicle, the NHP notified Greb via radio that there was an 'active misdemeanor warrant out for Jones' arrest. Greb advised Jones of the warrant and placed him under arrest. Greb began to search Jones, but before he could finish, Leary advised him that he could see Garcia moving around in the vehicle. Leary asked Jones if there were any weapons in the vehicle. Jones said that there was a .9 millimeter handgun in the vehicle. Leary watched Jones while Greb and newly-arrived NHP Trooper Michael Girulani, who had been called as a backup, went to retrieve the handgun.

Greb and Girulani approached the passenger side of the vehicle and asked Garcia to step out. Garcia complained of having a runny nose and asked for a Kleenex box from the front passenger seat. Greb checked the tissue box for weapons and, finding none, handed the box to Garcia. Girulani retrieved the handgun from a red duffle bag in the back of the vehicle.

Once the handgun was located, Greb returned to Jones and resumed his search. Greb discovered a glass pipe in Jones' front pants pocket, which appeared to contain marijuana residue. Greb then asked Jones if there were any narcotics in the vehicle, to which Jones replied, "Not that I know of." Greb then put Jones in his patrol car and went to assist Leary, who had retrieved a jacket for Garcia at Garcia's request. Greb checked the jacket for weapons and discovered a small bindle of

what he believed to be methamphetamine, plus a pack of burnt marijuana cigarettes. Jones stated that the jacket was his and acknowledged the presence of the narcotics inside.

Garcia was then asked to follow Leary back to the patrol cars. Garcia asked, "Can I take the Kleenex box, too?" Girulani picked up the Kleenex box and noticed that "it had a lot more weight to it than a normal Kleenex box would," in fact, "two to three times more." He also saw that a small portion of plastic was sticking out of the box, protruding between a couple of pieces of Kleenex. Girulani looked in the box and saw a plastic baggie. He handed the box to Greb, who noticed that "the tissues were pointed up as if something was underneath the tissues" and that "the box was a little bit heavier than it was before." Inside the box, Greb found a bindle of methamphetamine and some marijuana. Garcia was arrested for possession of controlled substances and placed in Leary's patrol car.

Next, Greb had his certified drug-detection dog "Bear" walk around the vehicle. Bear alerted to the odor of narcotics in the trunk and the glove box. Greb placed Bear back in his patrol car and began a hand search of the vehicle. Because the trunk was packed full of items, including a large speaker box and some mechanical tools, Greb and Girulani went right to the glove box. After obtaining the key from Garcia, Greb opened the glove box and found a loaded clip for the .9 millimeter handgun. Greb also noticed that the glove box screws "looked as if they had been off." Greb removed the screws and looked up underneath the glove box. There, he saw a large bundle wrapped in gray duct tape that smelled strongly of marijuana. At that point, Greb called for a tow truck to transport the vehicle back to NHP headquarters, where he believed that a more safe and thorough search could be conducted.

Garcia, Jones, and the vehicle were transported to NHP headquarters in Reno. Greb and Girulani continued the hand search of the vehicle. The troopers unloaded the trunk of the vehicle and found a Fix–a–Flat can in the area where Bear had alerted. Greb unscrewed the can's false bottom and found several wrapped bundles that appeared to contain methamphetamine.

Both Jones and Garcia were advised of their *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Both waived their rights in writing and agreed to make oral and written statements inculpating themselves and each other. The government filed a five-count indictment and later a six-count superseding indictment. Jones and Garcia jointly moved to suppress the physical evidence and their statements.

After an evidentiary hearing, the district court denied the motion to suppress. Garcia then entered a conditional plea of guilty on count one, conspiracy to possess with intent to distribute, and distribution of controlled substances, in exchange for the government's dismissal of the remaining counts. He was sentenced to 70 months' imprisonment. The judgment of conviction was entered on December 15, 1998. Garcia timely appeals.

## II

We review a district court's denial of a motion to suppress evidence de novo and its factual findings for clear error. *See United States v. Kemmish*, 120 F.3d 937, 939 (9th Cir.1997), *cert. denied*, 522 U.S. 1132, 118 S.Ct. 1087, 140 L.Ed.2d 144 (1998). Garcia challenges five aspects of the search and seizure.

First, he argues that the initial stop was improper. An automobile stop by police is a seizure within the meaning of the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Such a stop is subject to the constitutional requirement that it not be unreasonable. *See id.* If the officer had probable cause to believe that a traffic violation had occurred, the seizure

is reasonable. *See Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Garcia does not dispute that the vehicle was weaving within its lane or that it later crossed onto the shoulder of the highway. Trooper Greb had probable cause to pull the vehicle over based on its failure to maintain a single travel lane, in violation of Nev.Rev.Stat. § 484.305.

Second, Garcia argues that the continued detention of the vehicle and its occupants beyond the initial traffic stop was unreasonable. Specifically, Garcia contends that Greb's questioning of him exceeded the scope of the traffic stop. We reject this contention. In evaluating the reasonableness of an investigatory stop, courts should examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In this case, Greb testified that it was standard procedure to delay drivers for a short period of time to wait for an arrest report. Thus, Greb's brief conversation with Garcia during this period did not cause any additional delay. Nor did the conversation alter the subsequent chain of events. Rather, Garcia was arrested only after controlled substances were discovered in a tissue box in his possession.

Third, Garcia asserts that the second search of the tissue box was not supported by probable cause. Evidence may be seized without a warrant, however, when it is within "plain view." The "plain view" exception requires: (1) that the initial intrusion must be lawful; and (2) that the incriminatory nature of the evidence must be immediately apparent to the officer. *See United States v. Hudson,* 100 F.3d 1409, 1420 (9th Cir.1996) (citations omitted). In this case, both criteria are satisfied. The initial glance into the open tissue box was lawful and justified by Trooper Girulani's suspicion that the box was heavier than it should have been, and

heavier than it had been a few minutes earlier. In addition, Girulani saw a plastic baggie sticking out from between the tissues; methamphetamine already had been found in Jones' possession. Because the baggie was within plain view, no warrant was required.

Fourth, Garcia argues that the search of the trunk was invalid because it was neither a search incident to an arrest nor a proper inventory search. His argument ignores the evidence presented at the suppression hearing regarding the drug-detection dog's behavior. Because the dog alerted to both the trunk area and the glove box, probable cause existed to believe that both those areas contained narcotics. Police officers who have stopped an automobile legitimately and who have probable cause to believe that contraband is concealed somewhere within it may conduct a warrantless search of the vehicle. *See United States v. Ross,* 456 U.S. 798, 807 n. 9, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *see also Wyoming v. Houghton,* 526 U.S. 295, 119 S.Ct. 1297, 1304, 143 L.Ed.2d 408 (1999) (holding that "automobile exception" to Fourth Amendment's warrant requirement permits a search of any container in vehicle that might contain object of search, regardless of whether container belongs to driver or passenger).

Nevertheless, relying on *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996), Garcia maintains that once the vehicle was towed to NHP headquarters, it was no longer mobile and thus could no longer be searched without a warrant. The Supreme Court expressly rejected this argument in *Michigan v. Thomas,* 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982):

> In *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), we held that when police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may

conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody. We firmly reiterated this holding in *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975). *See also United States v. Ross*, 456 U.S. 798, 807 n. 9, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). It is thus clear that the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.

458 U.S. at 261, 102 S.Ct. 3079 (footnote omitted). We hold that the search of the vehicle was valid, despite the fact that it was not completed until after the vehicle was impounded.

█ Finally, Garcia argues that his confession should have been suppressed because it resulted from an illegal arrest. *See Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (excluding evidence that is "fruit of the poisonous tree"). Garcia was lawfully arrested after the seizure of controlled substances from the tissue box in his possession. Because Garcia's arrest was valid, and because he knowingly and voluntarily waived his *Miranda* rights, the district court properly refused to suppress his confession.

AFFIRMED.