[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 249 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 250 
¶ 1. Lilliana Maldonado was indicted by a grand jury in Rankin County, Mississippi, for possession of more than thirty grams of cocaine in violation of Miss. Code Ann. § 41-29-139. Following a jury trial, Maldonado was convicted on the possession charge. She was subsequently sentenced to thirty years in the custody of the Mississippi Department of Corrections. Maldonado filed a motion for new trial before the lower court, which was denied. She is now before this Court appealing from that judgment, citing the following issues for our consideration:
 1. Whether the lower court erred in failing to suppress evidence seized as a result of an illegal stop, search and seizure?
 2. Whether the lower court erred in disallowing the introduction into evidence of the contents of Maldonado's purse?
 3. Whether the jury verdict was against the overwhelming weight of the evidence?
 4. Whether the lower court erred in allowing an alternate juror to deliberate with the other jurors at the completion of the trial?
 5. Whether cumulative error requires reversal?
 6. Whether the sentence of thirty years in prison was grossly disproportional and unconstitutional?
 FACTS
¶ 2. On March 4, 1999, Rankin County Deputy Shannon Penn was sitting in his parked patrol car on Interstate 20, at approximately the sixty-three mile marker. Penn testified that he saw a white Dodge Intrepid pass by him and noticed that the driver was riding the brakes and continued to do so for approximately a mile. Penn cited this as strange behavior which prompted him to catch up to the car in his own vehicle. Penn further testified that he then observed the Intrepid, pulled in front of it and began to slow to approximately sixty-eight miles per hour, two miles per hour below the speed limit. According to Penn, the car would not pass him when he slowed down.
¶ 3. Penn stated that he then observed the Intrepid run over the shoulder of the road. Following that occurrence, Penn radioed in to the dispatcher to inquire about the vehicle and to inform the dispatcher that he would be involved in a traffic stop with this vehicle at the next available exit. He gave the dispatcher the license tag number on the Intrepid. The dispatcher informed him that the car was a rental car. At that time, Penn turned on his lights and pulled the Intrepid over citing "improper lane usage." After stopping the Intrepid, Penn got out of his patrol car and walked around to speak to the driver, Roy Esparza. Esparza informed Penn that he was handicapped and Penn noted that the rental car was equipped with handicap controls. The passenger riding with Esparza was Maldonado. *Page 251 
¶ 4. Penn warned Esparza about the manner in which he had seen him driving and asked Esparza for his license and registration. Esparza confirmed to Penn that he was driving a rental car and handed him the rental agreement. Penn testified that Esparza seemed very nervous and never made eye contact with Penn. Esparza told Penn that he was driving to Alabama to visit relatives. Penn stated that the situation appeared strange to him and he asked Esparza if he could search the car. Esparza agreed and Penn gave Esparza a search consent form to sign, stating that it was permissible with Esparza that Penn search the entire vehicle. Penn testified that he explained the consent form to Esparza before asking him to sign it and that he filled in some of the blanks on the form for Esparza, such as Esparza's name and the make of the vehicle. Penn then asked Esparza to execute the consent form at the bottom.
¶ 5. The consent form provided that Esparza could refuse a search of the car and also that, once Penn began the search, Esparza could stop him at any time. Esparza executed the form, allowing Penn to search the rental vehicle. The first place that Penn searched was the trunk of the car. Upon opening the trunk, he found that there was a wheel chair and other handicap equipment. In addition, Penn found two duffle bags which he proceeded to investigate. Penn found a substance in the bags that was later determined to be cocaine. Penn then radioed for back-up.
¶ 6. While waiting for his back-up, Penn read Esparza and Maldonado their Miranda rights. After other officers arrived on the scene, Maldonado was taken into custody and Esparza was asked by the officers to follow Penn to the sheriff's department in the rental car. Upon arriving at the police station, officers with the High Intensity Drug Trafficking Assistance Program (HIDTA) and the Drug Enforcement Agency (DEA) were present. While Penn was retrieving the cocaine from the trunk of Esparza's rented vehicle, the officers from the HIDTA and the DEA were speaking with Esparza and Maldonado. After Esparza had been informed that he would be transported to the county jail, Esparza asked Penn if he would get some of his personal things from the rental car to take with him.
¶ 7. Esparza described a bag with his personal items to Penn and Penn agreed to get it for him. In looking through the rental car to find the bag Esparza had requested, Penn noticed five suitcases in the back seat of the car with two stuffed animals sitting on top of them. Penn tried to push one of the suitcases over in an effort to find the bag Esparza wanted and when he did so, he found the suitcase to be "tremendously heavy." Penn testified that he unzipped the suitcase to see if Esparza's bag was possibly inside and when he looked inside the suitcase, he found more of the substance later found to be cocaine. Penn then looked in the other suitcases and confirmed that they all contained large amounts of this substance. It was later determined that there was a total of 716 pounds of cocaine packed in the rental car.
¶ 8. Esparza admitted to knowingly trafficking the cocaine, stating that he was short on cash and needed the money. The State offered Esparza a plea bargain wherein the State would recommend a sentence of eleven years instead of thirty in exchange for Esparza's testimony in Maldonado's case. Esparza agreed to the plea bargain. He testified at Maldonado's trial that, while in a bar in Houston, Texas, he met a man known as "Maestro" who offered him the trafficking job. Esparza stated that he and Maestro then formed a plan wherein Esparza would meet Maestro at a certain location on March 2, 1999. *Page 252 
Maestro provided Esparza with the rental car equipped with handicap controls and instructed him to check into a certain hotel. Maestro then promised to meet Esparza back at his hotel later that night.
¶ 9. Esparza testified that Maestro did, in fact, return to Esparza's hotel room late that night and that he brought Maldonado with him. Esparza stated that Maestro and Maldonado then proceeded to place the luggage containing the cocaine in the rental car, afterwards placing the two stuffed animals on top. Esparza testified that Maestro told him to listen to Maldonado's instructions because she had made the same trip before and she knew what to do. Maestro then checked Esparza out of the hotel while Esparza waited in the rental car, and Esparza and Maldonado departed on their journey.
¶ 10. Esparza and Maldonado traveled to Dallas where Esparza got onto Interstate 20 East. Esparza testified that, when the two stopped at a gas station, Maldonado pumped and paid for the gas, then she made a phone call to someone whom Esparza believed to be Maestro. According to Esparza, Maldonado told him that Maestro was on the same route, but far ahead of them and that her husband was also traveling the same route two to three hours ahead, supposedly looking out for any possible trouble with the police. Esparza stated that during the trip, Maldonado was instructing him as to what story they would tell the police if anything were to happen and they were to get caught. According to Esparza's testimony, Esparza was to say that he had picked Maldonado up in Houston and was giving her a ride to New York to look for her nephew.
¶ 11. In fact, that is exactly what Maldonado told the police when the two were apprehended by Penn. Maldonado still maintains that this version of the events which took place that day is the correct version and that she had never met Esparza before he picked her up in Houston. She further asserts that she has never known or had contact with anyone known by the name of Maestro. Maldonado's common law husband, Pablo Lozano, was called to the stand at Maldonado's trial as well. He testified that he had been living with Maldonado for eight or nine years and could verify that neither he nor Maldonado ever knew Maestro. Lozano also testified that Maldonado was not involved in the planning of any such drug trafficking scheme and had never done anything like this before. He also stated that, at the time that Esparza says Maldonado was at his hotel packing the rental car, she was actually at the bus station looking into a ride to New York to visit relatives.
¶ 12. Maldonado asserts that Esparza has made up his own version of the events implicating her in order to take the State's deal and lessen his prison sentence by telling them what they wanted to hear about her. She claims none of Esparza's story is true. Maldonado maintains that she needed a ride to New York and that Esparza offered her one, and that is the extent of what happened. She stated that she knew nothing about a plan to traffic the cocaine found in the rental car and that further, she had no idea that the cocaine was even in the car from the time she accepted the ride from Esparza until Penn found it upon searching the car.
¶ 13. After Esparza and Maldonado were arrested and jailed, Esparza decided he would no longer stick to the story which he claims Maldonado made up. Instead, he took the deal offered by the State and told the police his story about Maldonado's involvement from the very beginning. Esparza also told the police that Maestro wanted Maldonado to ride on the trip with him because she was experienced at this type of transaction and Esparza was not. *Page 253 
According to Esparza, Maldonado was to help him and make sure he was doing everything correctly. Contrary to Maldonado's claims, Esparza stated that Maldonado disclosed to him that she and Lozano had been involved in helping Maestro traffic drugs for the last three years.
¶ 14. Maldonado's purse was placed in the custody of the sheriff's department when the rental car was cleaned out after her arrest. Maldonado claims that inside her purse was evidence that would prove that she was not involved in the drug scheme and that her story about looking for her nephew was true. The piece of paper that Maldonado speaks of purports to have on it the names of her nephew and her niece, both of whom she claims were in New York at the time, as well as a phone number for someone who was to give Maldonado her niece's pager number once she arrived in New York. Maldonado referred to the piece of paper when asked at trial how she had planned to find her nephew when she got to New York. When the defense moved for her purse and its contents to be entered into evidence, the court refused to require the prosecution to produce it, stating that the request was untimely. However, the court did allow the defense to make a proffer before the judge, wherein Maldonado identified the slip of paper bearing names which she claimed belonged to her niece and nephew and the phone number of her niece's friend. The court denied the motion, again citing untimeliness, and the jury never heard or saw this evidence. Maldonado asserts that this was error.
¶ 15. Maldonado had never been arrested for any crime before this instance. She claims that she has never before been a party to any type of illegal drug activity. She maintains that she regularly stays at home and cares for her five grandchildren for whom she is the legal custodian. However, not convinced of her innocence, the jury voted to convict Maldonado of possession of more than thirty grams of cocaine, and she was sentenced to thirty years, the maximum sentence for that crime. She now appeals from the denials of her motions for JNOV and a new trial, citing errors which she believes require her case to be reversed by this Court.
 STANDARD OF REVIEW
¶ 16. Our standard of review regarding a motion for new trial is stated in McClain v. State:
 The challenge to the weight of the evidence via motion for a new trial implicates the trial court's sound discretion. Procedurally such challenge necessarily invokes Miss. Unif. Crim.R. of Cir. Ct. Prac. 5.16. New trial decisions rest in the sound discretion of the trial court, and the motion should not be granted except to prevent an unconscionable injustice. We reverse only for abuse of discretion, and on review we accept as true all evidence favorable to the State.
McClain v. State, 625 So.2d 774, 778 (Miss. 1993). See also Collier v.State, 711 So.2d 458, 461 (Miss. 1998); Herring v. State, 691 So.2d 948, 957 (Miss. 1997).
¶ 17. "The jury is the sole judge of the credibility of witnesses, and the jury's decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict." Billiot v. State, 454 So.2d 445, 463 (Miss. 1984). This Court may not make an assessment on the credibility of the trial witnesses as this task is one for the jury presiding over the matter. Kinzey v. State, 498 So.2d 814, 818 (Miss. 1986). When this Court analyzes a jury's verdict to determine whether it goes against the overwhelming weight of the evidence, we must keep in mind that the jury is the ultimate finder of fact. This *Page 254 
Court does not have the task of re-weighing the facts in each case to, in effect, go behind the jury to detect whether the testimony and evidence they chose to believe was or was not the most credible. The law provides:
 Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into finding of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution.
Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983).
¶ 18. Our standard of review regarding the legal sufficiency of the evidence is as follows:
 [W]e must, with respect to each element of the offense, consider all of the evidence — not just the evidence which supports the case for the prosecution — in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.
Wetz, 503 So.2d at 808.
 LEGAL ANALYSIS 1. Whether the lower court erred in failing to suppress evidence seized as a result of an illegal stop, search and seizure?
¶ 19. We agree with the State that Maldonado cannot challenge the search and seizure of Esparza's rental car because she has no standing to do so. Maldonado may have standing to challenge the initial stop of the vehicle made by Penn. See United States v. Garcia, 205 F.3d 1182, 1187-88 (9th Cir. 2000) (providing that the passenger in a car may challenge the initial stop of the vehicle, even if he has no standing to challenge the search and seizure of the vehicle and even if he has no possessory interest in the car). However, we are convinced by Penn's testimony that he observed Esparza committing a traffic violation and therefore proceeded to stop the car to give him a warning within the bounds of the law. Floyd v. City of Crystal Springs, 749 So.2d 110, 115 (Miss. 1999);Whren v. United States, 517 U.S. 806, 810 (1996) (citing Delaware v.Prouse, 440 U.S. 648, 659 (1979)); Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977) (all providing that a police officer need only have probable cause that a traffic violation has occurred). We find that Penn did have the probable cause needed to pull Esparza over due to what Penn believed to be unusual driving behavior and traffic violations.
¶ 20. On the other hand, we are convinced that Maldonado is misplaced in her *Page 255 
attempt to assert Esparza's personal constitutional rights by challenging the search of the car and the seizure of the suitcases and bags therein.See Rakas v. Illinois, 439 U.S. 128, 138-43 (1978). We find that Maldonado had no expectation of privacy in this situation. In Rakas, the United States Supreme Court provided that a person has standing to raise a Fourth Amendment illegal search and seizure claim only if that claimant himself has an "injury in fact" resulting from the illegal search. Id. According to the court in White v. State, the test, in fact, is whether the person challenging the search and invoking his Fourth Amendment rights has a reasonable expectation of privacy in the thing or place being searched. White v. State, 571 So.2d 956, 958 (Miss. 1990). The court in White also provided that "[p]roperty interests, possessory interests, and such concepts are not irrelevant and are not to be disregarded, but neither are they to be controlling." Id. at 959. "A defendant must establish that his own Fourth Amendment rights were violated by an unlawful search and seizure." Id.
¶ 21. The law further provides that Fourth Amendment rights are strictly personal and, unlike some other constitutional rights, cannot be asserted on behalf of a third party. Id. at 958; Waldrop v. State,544 So.2d 834, 837 (Miss. 1989); Ware v. State, 410 So.2d 1330, 1331-32 (Miss. 1982); Depreo v. State, 407 So.2d 102, 108 (Miss. 1981). See Brownv. United States, 411 U.S. 223, 230 (1973); Alderman v. United States,394 U.S. 165, 174 (1969). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Ware, 410 So.2d at 1332. SeeAlderman, 394 U.S. at 174. In Ware, the appellant was a passenger in a car, as Maldonado was here. Ware, 410 So.2d at 1332. The Mississippi Supreme Court held in that case that, without strong evidence of such, a person who is merely a passenger in a car would have no expectation of privacy in that car, thereby preventing him from invoking his Fourth Amendment rights in a search of the vehicle. Id. In other words, there would be "no automatic standing because of the mere fact of his being a passenger in the car. . . ." Id.
¶ 22. In the instant case, it is clear to this Court that Maldonado does not have standing to challenge the validity and/or legality of the search of the car conducted by Penn. In accordance with the case law provided, we cannot say that Maldonado had a reasonable expectation of privacy as a passenger in the car Esparza was driving, as it was neither in her name, nor is there any evidence that she was shown on the rental agreement as an additional person responsible for it. The rental agreement specified Esparza as the sole driver of the car and therefore the sole person responsible for the car. That much is clear through Esparza's signature on the agreement, not to mention the evidence that the car was equipped for handicapped drivers like Esparza. Maldonado, as a mere passenger, cannot challenge the search of the car or the seizure of the contents therein, even if the contents were found to be her personal property. See White, 571 So.2d at 959 (providing that property interests in contents of the vehicle are alone not enough to give a passenger standing to challenge the search of the car or the seizure of anything within the searchable limits of the car. In this case, there were no limits as the consent to *Page 256 
search form designated all parts of the car as searchable).
¶ 23. It matters not whether this Court believes that the search of the rental car conducted by Penn was a legal search insofar as it concerns the case against Maldonado. Legal or not, Esparza consented to a full search of the vehicle and he was the sole person with the authority to do so. Even assuming we could find that the search of the rental car was improper, Maldonado's rights were not violated because she had no privacy interests in the car or any containers therein. There is no evidence that Esparza was forced into signing the consent to search form given to him by Penn. While Maldonado argues on behalf of Esparza that Penn did not advise Esparza that he could refuse to sign the form or that Esparza could stop the search at any time, all of this information was contained in the consent agreement form signed by Esparza. Penn testified that he read the consent form to Esparza, explaining the provisions of it as he went, thereby putting Esparza on notice of his rights to refuse or stop the search of the vehicle. Esparza, however, did not invoke either of these rights.
¶ 24. Esparza did not have to take the plea bargain offered to him by the State. He could have asserted his rights and challenged the search and seizure, taking his chances at trial. However, he chose to take the deal and plead guilty to his crime and to further turn over incriminating evidence on Maldonado. It is simply not Maldonado's right to make arguments for Esparza when Esparza clearly did not intend to invoke his own Fourth Amendment rights, but rather opted to take the State's plea bargain in order that he would receive less time in prison than if he were to go to trial and be found guilty. It is definitely within the rights of the State to make such an offer to Esparza as long as the decision to take the offer was strictly Esparza's to make. Bordenkircherv. Hayes, 434 U.S. 357, 364-65 (1978); Chaffin v. Stynchcombe, 412 U.S. 17, 31 (1973). There is no evidence here to prove that Esparza was forced to take the State's deal and plead guilty. Rather, there is ample evidence that he chose to do so of his own volition, thereby waiving his defense of illegal search and seizure of the car. We find no merit to this issue.
 2. Whether the lower court erred in disallowing the introduction into evidence of the contents of Maldonado's purse?
¶ 25. Maldonado claims that the piece of paper in her purse at the time of her arrest contained the names of her niece and nephew, both of whom she says were in New York at the time of her arrest, and a phone number for a friend of Maldonado's niece who was to help her contact her niece upon her arrival in New York. Maldonado asserts that this piece of paper should have been allowed into evidence because it would prove she, in fact, was planning to go to New York to find her nephew on the day of her arrest. Maldonado accused the prosecution of committing a discovery violation in keeping this evidence from her after she had requested discovery on all tangible items in the State's possession. However, the facts in the record show that during the discovery process, the prosecution disclosed to the defense, in response to Maldonado's request, a list of the items they had obtained from the police regarding Maldonado's case. The State made it clear that Maldonado's attorney could obtain or come to look at any of the items listed if he chose to do so. Maldonado's purse was included on that list.
¶ 26. The State maintains that Maldonado never requested possession of *Page 257 
the purse or its contents from the prosecution before trial, despite the fact that Maldonado's attorney knew that it was in the State's possession. We find nothing in the record of this case to refute this assertion by the prosecution, such as copies of the defense's requests for production of evidence shown to include the purse and its contents, motions to compel any discovery not turned over or any other evidence of discovery violations by the prosecution. It appears, from the evidence with which we were provided, that Maldonado's attorney did not ask for access to Maldonado's purse or its contents for purposes of evidence until after Maldonado had already taken the stand and been examined and cross-examined at trial. In fact, it was only on redirect that Maldonado's attorney asked the court to require the prosecution to submit the purse and its contents to the defense. We find nothing that would indicate that the prosecution was anything but straightforward with Maldonado about the fact that her purse was in its possession. Because Maldonado's attorney waited until after Maldonado herself had been examined and cross-examined to demand that the purse be allowed into evidence, we agree with the trial judge that her request was untimely and should not have been presented to the jury.
¶ 27. It is a well established rule that redirect examination of a witness is generally limited to matters which were brought out on cross-examination of that witness. Lloyd v. State, 755 So.2d 12, (¶ 9) (Miss.Ct.App. 1999); Blue v. State, 674 So.2d 1184, 1212 (Miss. 1996); West v. State, 463 So.2d 1048, 1055 (Miss. 1985). The trial court has broad discretion when ruling on matters brought forth on redirect.Id. This Court may not disturb the lower court's rulings regarding matters concerning redirect examination unless there was a "clear abuse of discretion." Lloyd, 755 So.2d at (¶ 9); Blue, 674 So.2d at 1212. In the instant case, the trial court did allow a proffer of the evidence of the purse outside the presence of the jury in order to evaluate information sought to be elicited by defense counsel on his redirect examination of Maldonado. See Lloyd, 755 So.2d at (¶ 9). In doing so, the defense successfully preserved this issue for appellate review.See id.
¶ 28. However, this Court finds that the trial judge was correct in preventing the jury from hearing the proffered evidence of the purse and its contents because of untimeliness of the defense in seeking to introduce it as evidence. The defense had ample opportunity to bring this evidence out on direct examination of Maldonado in order to give the prosecution a fair chance to cross-examine on it, but chose not to do so. According to the case law cited above, allowing this evidence then on redirect would not have been proper and we are convinced the judge was well within his discretion to deny such evidence to be admitted before the jury due to untimeliness. Maldonado argues that the evidence of the purse and its contents would not have been unfair surprise to the prosecution since they had the purse in their possession and were familiar with its contents before trial. However, the trial judge did not cite unfair surprise in his reasoning to deny the introduction of this evidence. Rather, the rationale was that Maldonado was guilty of the procedural error of venturing outside the scope of redirect examination. Maldonado cannot blame the prosecution here for her own procedural error.
¶ 29. We note that even had her request to enter the purse into evidence been timely, it is completely lacking of any relevance to Maldonado's defense in and of itself. Maldonado's right to present any evidence before the jury in her *Page 258 
defense "is limited by considerations of relevance and prejudice."Hughey v. State, 729 So.2d 828, (¶ 12) (Miss.Ct.App. 1998). "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id.; M.R.E. 401.
¶ 30. We find that this piece of paper is simply extraneous evidence for which we have no use and that any value it may have is outweighed by the fact that it is useless to the defense and is a waste of the court's time. See M.R.E. 403 (providing that needless presentations of evidence which have no probative value may be properly excluded.). See also Foster v. State, 508 So.2d 1111, 1117 (Miss. 1987). Denying Maldonado the use of this piece of paper in her defense at trial simply did nothing to prejudice her. There was not anything preventing Maldonado from submitting other evidence that she was on her way to New York, such as the testimony of her niece, the testimony of the friend of her niece that was to provide her with the niece's pager number or any witnesses that she spoke with about her trip.
¶ 31. While there was testimony by Lozano that he believed Maldonado to be headed to New York to visit relatives on the day of her arrest, Maldonado has offered no proof of this, such as a witness who actually saw her at the bus station at the time that Esparza says she was loading cocaine into his rental car. Moreover, Lozano's testimony would seem a bit self-serving in light of the fact that Esparza told the police and the court that Lozano himself, together with Maldonado, has been involved with Maestro in quite a few illegal drug activities, including this one. Lozano is Maldonado's live-in boyfriend. It is not unlikely that he would wish to provide Maldonado, as well as himself, with an alibi for this crime.
¶ 32. In any event, Lozano's testimony was not enough to convince the jury of Maldonado's innocence and she has shown no further proof to this Court to substantiate her claims. Even in her plea before the judge that she be allowed to use the piece of paper as evidence, she did not show proof that the names on that paper were really those of her niece and nephew, that her niece and nephew were really in New York at that time, that her nephew was really missing or any other foundational support for this object which would purport to secure her acquittal.
¶ 33. Maldonado has provided no credible evidence which would show this paper to be anything other than a prop to accompany her story about her lost nephew in New York, a story which Esparza claims was strictly a ruse to fend off any suspicion of Maldonado's involvement in this crime. As such, we are convinced that this paper has no probative value of its own without further corroboration or foundation. Because we do not subscribe to Maldonado's theory that her right to present relevant evidence was violated or that she was prejudiced in some way by the exclusion of this evidence, we find no error here. See Lacy v. State,629 So.2d 591, 594 (Miss. 1993); Sayles v. State, 552 So.2d 1383, 1387 (Miss. 1989).
 3. Whether the jury verdict was against the overwhelming weight of the evidence?
¶ 34. As noted in the standard of review, we cannot overturn a jury verdict unless it is so completely "contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. . . ." Blissett v. State, 754 So.2d 1242, 1245 (Miss. 2000); Herring, 691 So.2d at 957. We must accept as true any evidence that tends to *Page 259 
support the verdict. Blissett, 754 So.2d at 1245;Ivy v. State, 589 So.2d 1263, 1267 (Miss. 1991); Thornhill v. State,561 So.2d 1025, 1030 (Miss. 1989).
¶ 35. In accordance with the above standards, we find that the jury verdict was not against the overwhelming weight of the evidence in this case. The State produced ample evidence to support their claims against Maldonado, including the incriminating testimony of Esparza, her accomplice in the drug trafficking scheme. The Mississippi Supreme Court provided that "an accused may be convicted on the uncorroborated testimony of an accomplice." Culberson v. State, 379 So.2d 499, 503 (Miss. 1979). The jury evidently found that Esparza was a credible witness and we cannot disturb those findings without proof that they were completely unsupported by the evidence. Hughey, 729 So.2d at (¶ 7); Pleasantv. State, 701 So.2d 799, 802 (Miss. 1997). We decline to interfere with the jury's duty to assess the credibility of witnesses. The fact that the jury found Esparza to be a believable witness and apparently accepted his testimony as true is sufficient to sustain Maldonado's conviction. SeeHughey, 729 So.2d at (¶ 7) (stating that testimony from a witness found to be credible by a jury is enough to convict.).
¶ 36. In addition, before this Court may reverse a jury verdict, we must find that no reasonable juror could have found that the defendant was guilty beyond a reasonable doubt. Nicolaou v. State, 612 So.2d 1080, 1083 (Miss. 1992); Benson v. State, 551 So.2d 188, 193 (Miss. 1989). It is the opinion of this Court that the jury was shown adequate proof with which to find that Maldonado was aware of and in possession of the 716 pounds of cocaine found in Esparza's rental car. Esparza's testimony, which was adopted by the jury as true, showed that Maldonado was not only aware of the presence of the cocaine in the vehicle, but that she was "intentionally and consciously in possession of it," as she had helped to pack it in the car and was to be the experienced leader of this illegal excursion. Blissett, 754 So.2d at 1244; Curry v. State, 249 So.2d 414, 416 (Miss. 1971). This evidence unmistakably connects Maldonado with the drugs found in the rental car. See Guerrero, 746 So.2d at (¶ 18);Campbell v. State, 566 So.2d 475, 477 (Miss. 1990); Keys v. State,478 So.2d 266, 268 (Miss. 1985); Powell v. State, 355 So.2d 1378, 1379 (Miss. 1978).
¶ 37. Further, we note an observation made by the State that there is sufficient evidence to show that Maldonado was more than likely not going on a trip to see her family because the bags and suitcases found by Penn, while full of cocaine, did not contain clothing or any other basic necessities for someone taking such a planned trip. Maldonado would have us believe that she was making a trek to New York to find her lost nephew, that she would be there for an unspecified time (most likely until she found her nephew) and that she planned to make arrangements to meet up with her niece, yet she packed absolutely nothing for her stay. While this observation is not wholly damning to Maldonado, it is certainly worth consideration as it provides the State a viable theory with which to contradict Maldonado's claims of innocence. The testimony of Esparza served the jury with a plausible explanation as to why Maldonado had no personal belongings packed and what she was really doing in his rental car that day.
¶ 38. The jury heard all of the evidence offered in this case and voted to return a verdict that Maldonado was guilty of the crime of possession of more than thirty grams of cocaine. We cannot say that the *Page 260 
jury was incorrect in their assessment of this case as, looking to the evidence most favorable to the verdict, we find that the jury's conclusions here are reasonable and in line with the proof offered to them.
 4. Whether the lower court erred in allowing an alternate juror to deliberate with the other jurors at the completion of the trial?
¶ 39. Maldonado cites reversible error by the judge in allowing an alternate juror to retire to the deliberation room with the rest of the jury after the close of the trial. Mississippi law provides that "[a]n alternate juror shall be discharged at the time the jury retires to consider its verdict." Miss. Code Ann. § 13-5-67 (Supp. 2000). Clearly, mistake or not, the judge was in violation of this statute in the instant case. The alternate juror here was allowed to go back to the jury room with the other jurors while they began to deliberate on Maldonado's guilt or innocence. According to the Mississippi Supreme Court case of Luster v. State, alternate jurors may not be present, nor may they participate in any discussions with the other jurors if they are not replacing one of those jurors for the remainder of the deliberations. Luster v. State, 515 So.2d 1177, 1180 (Miss. 1987). However, that case also provides that nothing more than harmless error will result from such a mistake by the judge if the appellant has failed to show that he or she was prejudiced by the alternate juror's presence during deliberations. Id.
¶ 40. The judge in the instant case noted that the alternate juror did not contribute to the deliberations in any way, nor was the verdict close to being decided when it was discovered that the alternate juror was inadvertently allowed in the jury room. This is similar to the situation in Luster, except in that case, the court only presumed that the alternate juror refrained from participation in the deliberations without verification of that fact. Id. Here, the judge actually polled the jurors to be certain that no harm was done by allowing the alternate juror in the room. The jurors assured the judge that they were not close to a verdict at that time and that the alternate had not participated in the discussion of the case. As such, we see no detrimental effects of the alternate juror's short respite in the deliberation room. In accordance with the decision of the Mississippi Supreme Court in Luster, we find that, while there was a clear violation of the statute regarding this issue, it constituted only harmless error. Id.
¶ 41. Maldonado has produced no evidence to this Court to show that she was prejudiced or that she did not receive a fair trial because of this error. She only argues that because the statute was violated, per se, this calls for a reversal. Yet, she cites no authority which would challenge the ruling in Luster. Further, she made no objection to this error at the time of its occurrence. The record shows that the defense in this case had every opportunity to bring the trial to an end because of this mistake and yet, it did not. In fact, the transcript including conversations between the judge and the attorneys regarding this issue reveals that the judge as much as offered to grant a mistrial because of his mistake. However, Maldonado's counsel chose to allow the jury to continue deliberating, thereby agreeing to defer to their verdict despite this admitted oversight by the judge. Because of defense counsel's failure to proactively seek prompt reparation for this error, and because we find that, in any event, this error did not serve to prejudice Maldonado, we disagree with Maldonado that this issue requires reversal on our part.
5. Whether cumulative error requires reversal?
¶ 42. We find that this issue has no merit in that Maldonado has failed to *Page 261 
prove any reversible errors which she has cited on the part of the trial court or that those errors served to prejudice her case. See Nicolaou, 612 So.2d at 1084; Edlin v. State, 533 So.2d 403, 409-10 (Miss. 1988).
¶ 43. Furthermore, Maldonado did not raise the cumulative error doctrine at the trial level and as such, we cannot now entertain it at the appellate level. Gibson v. State, 731 So.2d 1087, 1098 (Miss. 1998);Howard v. State, 507 So.2d 58, 63 (Miss. 1987) (providing that an appellant cannot cite error on the part of a trial judge before a reviewing court when the trial judge was not himself presented with such error.). As such, this issue must fail.
 6. Whether the sentence of thirty years in prison was grossly disproportional and unconstitutional?
¶ 44. In Stromas v. State, the Mississippi Supreme Court proclaimed: "[d]rug offenses are very serious, and the public has expressed grave concern with the drug problem. The legislature has responded in kind with stiff penalties for drug offenders. It is the legislature's prerogative, and not this Court's, to set the length of sentences." Stromas v. State, 618 So.2d 116, 123 (Miss. 1993). Maldonado's claim that a thirty year sentence is grossly disproportional to the crime of possessing and attempting to transfer 716 pounds of cocaine is grossly inaccurate.
¶ 45. Maldonado was indicted and convicted under the Mississippi statute § 41-29-139, which explicitly provides that a defendant who possesses thirty grams or more of a controlled substance classified as either a Schedule I or Schedule II substance, shall serve not less than ten years, but no more than thirty years in prison and be fined no more than one million dollars. Miss. Code Ann. § 41-29-139(c)(1)(E) (Supp. 2000). Cocaine is found in Schedule II of the list of controlled substances, thereby making the possession of more than thirty grams of cocaine subject to a maximum penalty of thirty years in prison. Miss. Code Ann. § 41-29-115(a)(4) (Supp. 2000). We find that it was proper for the judge to sentence Maldonado to the maximum sentence allowed by statute since she was found to be in possession of such an exorbitant amount of cocaine.
¶ 46. There is nothing in our Mississippi statutes which dictates that simply because one is a first time offender, she should receive a reduced sentence for her crime. Regardless, the evidence here shows that while this may be Maldonado's first arrest, she is likely no first time trafficker. Miss. Code Ann. § 41-29-149 speaks to suspended and lessened sentences for first time offenders. Miss. Code Ann. §41-29-149 (Rev. 1993). That statute does not provide that a judge isrequired to take into account the first offender status when sentencing the defendant. Rather, to be sure, what the statute provides is that the judge may suspend a portion of the sentence for a first time offender inhis or her discretion, according to the facts of each case. Miss. Code Ann. § 41-29-149(a) (Rev. 1993). The judge's choice to sentence Maldonado to the maximum sentence of thirty years does not invite error here.
¶ 47. "As a general rule, a sentence will not [be] disturbed on appeal so long as it does not exceed the maximum term allowed by statute."Stromas, 618 So.2d at 122. See Wallace v. State, 607 So.2d 1184, 1188 (Miss. 1992); Corley v. State, 536 So.2d 1314, 1319 (Miss. 1988). When the trial judge does impose a sentence within these statutory guidelines, as is the case here, the sentence will usually be upheld and will not be thought to *Page 262 
invoke the Eighth Amendment right against cruel and unusual punishment.Peterson v. State, 740 So.2d 940 (¶ 31) (Miss.Ct.App. 1999).See U.S. Const. amend. VIII.
¶ 48. It matters not that Esparza, also an offender in this incident, received a lesser sentence because of his plea arrangement with the State. See Peterson, 740 So.2d at (¶ 30). As we previously noted, the State is well within its rights to offer such plea bargains to defendants in return for guilty pleas, testimony against a co-defendant or both. Bordenkircher, 434 U.S. at 364-65; Chaffin, 412 U.S. at 31. This Court may not interfere with such valid plea bargain arrangements which serve to aid the State in procuring the evidence needed to convict criminals such as Maldonado. See id. As such, Maldonado's argument that her sentence was disproportional to Esparza's and should therefore be vacated is, like all of her previous issues, devoid of any merit.
¶ 49. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY OFCONVICTION OF POSSESSION OF MORE TAN THIRTY GRAMS OF COCAINE AND SENTENCEOF THIRTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OFCORRECTIONS. ALL COSTS OF THIS APPEAL ARE ASSESSED TO RANKIN COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P. JJ., PAYNE, THOMAS, LEE, MYERSAND CHANDLER, JJ., CONCUR.
IRVING, J., CONCURS IN RESULT ONLY.