# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00768-COA

**ANFERNEE HARRIS A/K/A LIL MACK A/K/A THIRO**  **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**  **APPELLEE**

DATE OF JUDGMENT: 12/05/2022
TRIAL JUDGE: HON. ALBERT B. SMITH III
COURT FROM WHICH APPEALED: TUNICA COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: JOHN KEITH PERRY JR.
GARRET T. ESTES
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
BY: ALEXANDRA LEBRON
DISTRICT ATTORNEY: BRENDA FAY MITCHELL
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 03/10/2026
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Anfernee Harris appeals his conviction of second-degree murder and life imprisonment sentence for the death of Skyeesha Pige, who was an innocent victim of a shooting between Harris and another individual. Harris was tried with co-indictee Dontarrius Hibbler after Harris's motion to sever was denied. On appeal, Harris raises several issues, including the denial of his severance motion, prosecutorial misconduct for inappropriate remarks made during closing, his sentencing without a separate sentencing hearing, and juror misconduct warranting a new trial. Having considered the record and the arguments of counsel, we affirm Harris's conviction and sentence.

## Facts and Procedural History

*Background Facts*

¶2.     On March 31, 2019, Skyeesha Pige left home where she and her fiancé, Ray Conley, lived with their children, to attend church.  Conley stayed home to cut the grass and invited friends Tyrone Stevenson and Ronnie Jackson to come over for a fish fry and barbecue. Stevenson arrived first and went inside to retrieve a cooler for the drinks.  Shortly thereafter, Jackson arrived and began talking to Conley in the driveway.

¶3.     While Jackson and Conley were speaking, they noticed Harris walking in the street towards Andrea Norwood's ("DeDe") house across the street.  They also saw Ronald Ladd drive down the street, pull over, and get out to speak with Harris.  At this point, Tevin Vardaman drove around the curve in his maroon Nissan Maxima with Charles Golden riding with him.  Vardaman's car approached Harris and Ladd, and as Conley described it, Vardaman "began bouncing his car like he wanted to do something," but he did not stop.  As Vardaman drove off, Harris fired several shots at Vardaman's vehicle.  It is not known when, but at some point, Golden exited Vardaman's vehicle and left the scene.

¶4.     Vardaman turned his car around, blocked the street, and got out.  He started taunting Harris, stating that Harris could not hit him.  At this point, Harris and Ladd got in Ladd's vehicle and tried to get away.  But they were blocked by cars parked on the side of the street, so they both got out.  Ladd ran into DeDe's house, while Harris ducked behind Ladd's car. Dontarrius Hibbler came out of De De's house and joined Harris behind Ladd's vehicle.

2

Harris gave Hibbler the gun and started towards DeDe's house, while Hibbler began shooting at Vardaman. When Hibbler stopped, they all heard a loud crash. Ladd came out of DeDe's house and jumped into his car. Harris and Hibbler joined him, and they all sped away.

¶5.    The loud crash was determined to be Pige, who was returning from church, colliding into Vardaman's vehicle. A stray bullet had pierced her windshield and struck her in the eye. Medical assistance arrived, but Pige later succumbed to her injuries at the hospital.

*Investigation*

¶6.    Tunica Sheriff's Department personnel Captain Katie Ridley, Captain Bernadette Logan, and Lieutenant Markendrick Keys arrived on scene to investigate. They took photographs, collected physical evidence, including bullet casings, and spoke to witnesses. Logan spoke to both Conley and Vardaman, but neither of their statements was audio- or video-recorded. After obtaining a search warrant, Logan searched Vardaman's car. She found no weapons, only a jacket and ID belonging to Charles Golden, who was not at the scene. Golden was later located, but he had no weapons on his person, and after tracking his route back to the scene, law enforcement still found no weapons.

¶7.    Deputy Logan was then contacted by another law enforcement officer, Jaylin James, who had gone to the Cottenland Village Apartments nearby and found one of the shooting suspects. Logan arrived at the apartments, photographed Harris, and James took Harris into custody. Law enforcement found no weapons at Harris's apartment location either.

¶8.    In addition to the unrecorded statement he made on the day of the shooting, Conley

also gave a written statement to Lt. Keys on April 7, 2019. In it, he said that all three defendants had been shooting, with Harris and Ladd (aka J-Rock) firing at least four to five shots at Vardaman, and with Hibbler (aka DT) firing twelve times or more. Keys also took a statement from Stevenson on the same day. Conley came to the station and gave a third statement (written) on May 15, 2019, in which he clarified that Ladd had not been shooting, which led to Ladd receiving a lesser charge. On July 10, 2019, Keys presented both Conley and Stevenson with a photo line-up that included photos of Harris and Ladd.[1] Both were able to identify Ladd as the driver who left the scene with Harris, who was one of the shooters. Hibbler's photo was not included in the photo lineup.

*Indictment*

¶9. On August 14, 2019, Harris and Hibbler were indicted and charged with second degree murder for Pige's death, more specifically that each:

> while aiding and abetting with others or acting in concert with each other or others, did willfully, unlawfully, feloniously, without any premeditated design to effect death but in the commission of an act eminently dangerous to others and evincing a depraved heart, without authority of law and not in necessary self-defense, kill Skyeesha Pige A/K/A "Sky", a human being, by shooting her in the head with a pistol, with enhanced punishment for use of a firearm in the commission of a felony.[2]

---

[1] Keys referred to it as a "six pack line-up," where law enforcement presents a photo of the suspect or suspects among other photos of random individuals, for a total of six photos. The witness then identifies the photo or photos of the suspect or suspects from this group.

[2] They were also charged with attempting to cause bodily injury to Charles Golden (Count II) and with attempting to cause bodily injury to Tevin Vardaman (Count III). These charges were later nolle prosequied.

4

Ladd was charged with being an accessory to murder after the fact. All three were scheduled to be tried together.

*Motion to Sever*

¶10.    On March 15, 2021, Harris filed a motion to sever his case from Ladd and Hibbler's for trial. Ladd also filed a similar motion. Harris argued that the jury would be unable to distinguish Harris's acts from those of his co-defendants. Moreover, Harris claimed that videotaped statements given by Harris and Ladd implicated each other, as well as Hibbler. The admission of these statements, Harris argued, would violate the defendants' Fifth Amendment rights against self-incrimination. The State responded, agreeing that Ladd's case should be severed, but not Hibbler's and Harris's. On March 21, 2021, the court entered an order granting Ladd's motion but denying Harris's. The order reflects that at the hearing on the motion, the State agreed it would not enter any hearsay statements made by Hibbler that would implicate Harris. Thus, Harris and Hibbler were tried together.

*Trial*

¶11.    Two attempts to try Harris and Hibbler ended in mistrials due to an inadequate number of jurors remaining in the jury pool after jurors were excused for cause. A third trial began on November 28, 2022.

*Voir Dire*

¶12.    During the court's voir dire, the court excused numerous jurors for various reasons, including that they knew or were related to the defendants. The court also asked if anyone

5

was related to the parties, witnesses, or the victim by blood or marriage. Several jurors responded to these questions, and most replied that they could be fair and impartial despite their connection or knowledge of the case. The few who said they could not be fair were struck by the court for cause. Harris and Hibbler's attorneys then questioned the venire about jurors knowing each other and other matters.

¶13. During the jury selection conference, the court recapped the jurors it had already stricken for cause and struck others. Harris's attorney pressed for Juror 34 to be struck for cause because he knew Norwood (DeDe) and Lt. Keys, and had law enforcement friends or family. The court overruled the objection. Harris's attorney also sought to have other jurors struck for cause: Juror 24, who was the victim's cousin; Juror 38, who knew law enforcement officers; and Juror 42, who worked nights and may not be attentive. The court overruled those requests as well. The court proceeded with the peremptory strikes for both the State and the defense. Jurors 24 and 38 were struck during this process, and the final jurors were chosen.

*Testimony and Evidence*

¶14. After opening statements, the State called the officers who responded to the dispatch call of the shooting (Ridley, Logan, and Keys). Each testified to their observations and actions at the scene as discussed above, including the photographs they took and the evidence they collected. One photograph showed the hole in the windshield of Pige's car where the bullet had traveled and struck Pige. Ridley stated that no weapons were recovered at the

6

scene, but she found shell casings across the street from Conley's home. Logan testified about the search of Vardaman's vehicle and how they located Golden and backtracked his route from the scene. Despite the vehicle search and search of the crime scene, no weapons were located.

¶15. Keys testified that he gathered one live round at the scene and seventeen shell casings, which were sent to the forensics lab for examination. Photographs taken of each shell casing at the scene were entered into evidence, including close-ups that showed brand information on each. Two shells and one live round were admitted into evidence. Keys further testified about his interviews with Stevenson and Conley individually on April 2, 2019. He told the jury that said he showed these witnesses a photo line-up that included photographs of Harris and Ladd. Keys stated that Jackson, who also was shown the photo line-up by another officer, was unable to identify Harris, but Conley and Stevenson were able to identify both Harris and Ladd. These photo line ups were admitted into evidence.

¶16. Officer James testified that he was directed to the Cottenland Village apartments just down the street from the crime scene to look for any suspects. James stated that he saw Harris on the phone behind a door of one of the apartments and told him to step out. He detained Harris until other officers arrived to confirm that Harris was a suspect. Ultimately, James transported Harris to the Tunica County jail. He stated that he did not conduct, nor did he see any other officer conduct, a gunshot residue test on Harris. James also stated that there were no weapons or anything associated with the case found in the search of the

apartment where he found Harris.

¶17. The State called Dr. David Arboe, who was accepted as an expert in the field of forensic pathology without objection from defense. Arboe testified that he performed an autopsy on Pige's body, examining it both externally and internally. He identified photographs he had taken during the autopsy and bullet fragments he found in Pige's head and neck, which were entered into evidence. Arboe testified that the cause of Pige's death was a gunshot wound to the head, but he could not determine from what distance. Arboe also concluded that the manner of Pige's death was homicide.

¶18. The State then called the lay witnesses who were present at the Conley home: Jackson, Stevenson, and Conley. Stevenson testified about the events that morning. He said he saw Vardaman's car traveling down the street and saw Harris begin shooting at it. Stevenson confirmed the photo line-up pictures in which he identified Harris and Ladd. On cross-examination, Stevenson testified that as he was coming out, one of the children who was also in the house tried to come out with him. In an attempt to stop the child from exiting the house, Stevenson said he fell but got right back up. However, this is why he would not recall when the first shooter appeared. Stevenson also admitted that he had seen pictures of the defendants from the Sheriff's Department's website on his phone prior to giving his statement and viewing the photo line-up on April 2, 2019. Upon re-direct, however, Stevenson testified that he would have been able to identify the defendants even without the pictures from the website.

8

¶19. Conley, Pige's fiancé, testified to the facts as previously described, i.e., that he saw Harris walking down the street, Ladd drive up and speak with Harris, and Vardaman driving up and "bouncing" his car in front of Harris and Ladd. Conley said that Harris then shot at Vardaman's car as Vardaman was driving off. Ladd and Harris tried to leave, but were not able to turn Ladd's vehicle around. Hibbler left DeDe's house and joined Harris behind the car. Conley stated he saw them fumble with something, and then Harris began running towards DeDe's house as Hibbler began shooting at Vardaman. Conley said that in the first statement he gave police, he said it looked like Ladd was shooting, but he could not be sure. Conley then confirmed the line-up photos given to him by Keys where he identified Harris and Ladd.

¶20. On cross-examination, Conley testified that about ten to fifteen seconds elapsed between the last shot that Hibbler fired and the crash of the vehicles and that three to four seconds elapsed between when Harris began running towards DeDe's house and when Hibbler began shooting. Conley confirmed that he had given three statements, including one on the scene, one in April, and one in May. Conley testified that in his first statement at the scene, he said he had not seen Harris fire a gun. Then, in his April written statement, he said that Harris and J-Rock (Ladd) fired at least four shots and that Hibbler (DT) fired twelve times or more. Conley agreed that in his May statement he said Ladd had not been shooting at all. When asked why he did not tell police in his first statement that Harris was the first shooter, Conley testified that he was traumatized and was confused by being asked multiple

9

questions at the same time. Conley further testified that he changed his first statement to the police in a later statement after thinking more about the incident.

¶21. The State's final witness was Melissa Deberry, a forensic specialist in firearm examinations who has been employed by the Mississippi Forensics Laboratory since 2006. After being accepted as an expert with agreement of the parties, Deberry explained the different parts of a bullet, namely, the exterior casing or cartridge, which gets ejected at firing, and the interior parts, including a pellet, a primer, and the cap of the bullet or projectile. She said that casings can be compared to each other by looking at whether the caliber is the same and whether the shape of the firing pin impression and breach face marks are the same. This comparison is done microscopically.

¶22. With her expertise, Deberry can also "classify" projectiles to determine the kind of gun they came from. Deberry testified that she was asked to analyze two bullet fragments retrieved from Pige's neck. She was able to classify one as having the characteristics consistent with a .38 caliber or 9 mm barrel with six lands and grooves and a hard right twist. The other fragment was mutilated and she could not identify any individual characteristics on it. Deberry said she was also provided seventeen 9mm casings. Comparing the casings to each other, she determined that all had been fired from the same gun. Deberry confirmed her report, which was then entered into evidence without objection.

¶23. On cross-examination, Deberry was presented with a forensics report from a 2018 shooting with a victim named "Skykeesh Pige," which had been prepared by another

examiner for another case.[3] Deberry explained that each examiner places his initials on the specimens provided, so the examiner in the 2018 case was examining a completely different casing than the one she examined in 2019. Deberry explained that a second reviewer looked at and verified her work before the report was submitted. Deberry also testified that with an extended clip, a semi-automatic gun could hold thirty to thirty-three rounds.

¶24. At the close of the State's case, Harris and Hibbler both moved for directed verdicts which the court denied. The court then determined from Harris and Hibbler that neither desired to testify. Neither presented any evidence or testimony in his own defense, and both parties finally rested.

¶25. The court and counsel discussed the proposed jury instructions, including the form of the verdict, to which Harris voiced no objection. It read:

> Your verdict regarding the Defendant, ANFERNEE HARRIS A/K/A "LIL MACK" AKA "THIRO", should be written upon a separate sheet of paper, need not be signed by you, and may be in any one of the following forms:
>
> **COUNT ONE: SECOND-DEGREE MURDER**
>
> 1a. If you find the Defendant, ANFERNEE HARRIS A/K/A "LIL MACK" AKA "THIRO" guilty of Count I, Second Degree Murder and agree to fix the penalty of life imprisonment, then the form of the verdict shall be,

---

[3] The report was marked for identification but never entered into evidence. Deberry identified that the report came from her agency but reflects an analysis of materials submitted under a different case number and performed by a different examiner. In that case, the examiner classified one of the projectile jackets as coming from a .38 caliber or 9 mm barrel with six lands and grooves and a hard right twist.

> ***"We, the Jury, find the Defendant,***
> ***ANFERNEE HARRIS A/K/A "LIL MACK" AKA "THIRO",***
> ***guilty of Count One, Second Degree Murder, and fix the penalty***
> ***at life imprisonment."***

1b.     If you find the Defendant, ANFERNEE HARRIS A/K/A "LIL MACK" AKA "THIRO", guilty of Count I, Second Degree Murder or unable to fix the penalty at life imprisonment, then the form of your verdict should be

> ***"We, the Jury, find the Defendant,***
> ***ANFERNEE HARRIS A/K/A "LIL MACK" AKA "THIRO",***
> ***guilty of Count One, Second Degree Murder, but are unable to***
> ***agree to fix the penalty at life imprisonment."***

1c.     If you find the Defendant, ANFERNEE HARRIS A/K/A "LIL MACK" AKA "THIRO", not guilty of Count One, Second-Degree Murder, then the form of your verdict shall be:

> ***"We, the Jury, find the Defendant,***
> ***ANFERNEE HARRIS A/K/A "LIL MACK" AKA "THIRO",***
> ***not guilty of Count One Second Degree Murder.***

After being instructed, the jury heard closing arguments.

*Closing Arguments and Verdict*

¶26.    In its closing argument, anticipating that the defense would point out things that witnesses could not remember or remembered differently later, the prosecutor stated:

> Does that matter? Seriously, does that matter? This lady is leaving church worshiping and loses her life. I said to you that's not the conduct that should be allowed in Tunica County. That's not appropriate. No matter what anybody tells you.

Neither defendant objected to this statement. Later in the State's rebuttal argument, the prosecutor told the jury, "I don't apologize for being passionate about this case. And I never

12

will. This is senseless. This is conduct that should not be tolerated. These defendants deserve to be found guilty." Again, neither defendant objected to the State's rebuttal argument.

¶27. During deliberations, the jury sent a note that read, "If jury can't decide on life, does the judge decide the number of years of the sentence?" The court clarified that it was unable to give further instructions and directed the jury to resume deliberations. The jury then found Harris guilty of second-degree murder and "fix[ed] the penalty at life imprisonment." The jury was polled, and all jurors agreed that the verdict was his or hers.

¶28. Thereafter, the trial transcript reads:

> The Court: The Defendants are remanded in the custody in the Tunica County Sheriff's Department. The court now sentences you under 97-3-21; convicted of Second Degree Murder.
>
> (The Court Confers with Counsel Regarding Separate Sentencing Hearing)
>
> The Court: Mr. Shah, what do you say?
>
> Mr. Shah: I don't think the court has the authority what the jury has reached.
>
> (Further Discussion Separate Sentencing)
>
> (The Court Proceeds To Sentence - Life in Prison)[.]

In response to this Court's order to supplement the record to include the discussion on a sentencing hearing, the circuit court stated:

> Regarding the bench conference/separate sentencing hearing; Mr. Rosharwin Williams and Mr. Whit Cooper agreed that this portion of the proceedings were conducted off of the record.

13

In addition, the circuit court stated:

> Regarding the Court's comments during sentencing, Mr. Rosharwin Williams and Mr. Whit Cooper agreed that, other than handing down sentences of Mr. Harris and his co-defendant, Mr. Hibbler, the Court did not make any additional comments during sentencing.

*Motion for Judgment Notwithstanding the Verdict or New Trial*

¶29. Harris filed a "Motion for Judgment of Acquittal Notwithstanding the Verdict or, in the Alternative, a New Trial." In it, Harris raised the following issues: (1) that the court erred when it denied the Defendant's motion to sever filed on March 12, 2021, (2) that the court erred when it failed to strike Juror 24 for cause, (3) that the court erred in not granting Defendant's motion for a directed verdict of acquittal at the close of the State's evidence and at the close of all of the evidence for the reasons as stated herein above, (4) that the court erred in refusing Defendant's instruction D-1, (5) that the court should grant a new trial based on newly discovered evidence that Juror 2, Juror 4, and Juror 10 knew the victim or victim's family and had knowledge about the case prior to voir dire but remained silent when asked under oath whether they knew the victim or knew anything about the case prior to voir dire. Harris attached printouts from Facebook to support his allegations concerning these jurors. The trial court summarily denied this motion on May 24, 2023, and Harris filed his notice of appeal on June 15, 2023.

¶30. On appeal, Harris raises the following issues:

    (1)    Whether the court erred in denying Harris's motion for severance.

    (2)    Whether the verdict is against the overwhelming weight of the

14

evidence.

(3) Whether the prosecutor committed misconduct that created unjust prejudice against Harris.

(4) Whether jurors' withholding information during voir dire constituted juror misconduct warranting reversal.

(5) Whether the jury improperly sentenced Harris to life imprisonment, i.e., whether the court erred in sentencing Harris without a sentencing hearing.

(6) Whether the court erred in summarily denying Harris's motion for judgment notwithstanding the verdict (JNOV).

**Discussion**

**I.      Whether the court erred in denying Harris's motion for severance.**

¶31.    Harris argues that the circuit court should have severed his case from Hibbler's because the jury would have a difficult time distinguishing his acts from Hibbler's and because Ladd had given a statement implicating Harris. Thus, he claims, he was entitled to a severance.

¶32.    Rule 14.3(a)(2) of the Mississippi Rules of Criminal Procedure, titled Severance in Non-Death Penalty Cases, provides:

> The court may, on motion of the state or a defendant, grant a severance of defendants or offenses if it is deemed appropriate to promote the fair determination of a defendant's guilt or innocence of each offense.

MRCrP 14.3(a)(2). A severance is not a right of the defendant, but it is a determination made by the court at its discretion. *Pope v. State*, 330 So. 3d 409, 424 (¶65) (Miss. Ct. App. 2021). "A trial court's denial of a motion to sever will not be overturned on appeal absent an abuse

15

of discretion." *Hayes v. State*, 168 So. 3d 1065, 1074 (¶34) (Miss. Ct. App. 2013).

¶33. There are two key factors that courts consider in determining a motion for severance.

> When considering a motion to sever, a trial court must analyze the factors provided by our Supreme Court in *Duckworth v. State*, 477 So. 2d 935, 937 (Miss. 1985). First, the court must look to whether a co-defendant's testimony tends to exculpate himself at the expense of his co-defendant. *Id*. In other words, the court looks to whether there "appear[s] to be a conflict of interest among the co-defendants." *Id*. Next, the court determines whether "the balance of the evidence introduced at trial go[es] more to the guilt of one defendant than the others." *Id*. The denial of a severance only becomes error when the defenses of the co-defendants are adverse to one another. *Rigby v. State*, 485 So. 2d 1060, 1061 (Miss. 1986).

*Pope*, 330 So. 3d at 424 (¶66).

¶34. Examining the facts of cases involving severance claims helps to understand the application of these factors. For example, the *Duckworth* case involved an armed robbery at a grocery store. *Duckworth*, 477 So. 2d at 936. After Elton Duckworth and Willie George Carter had entered, Duckworth pulled a gun on the clerk, and Carter tied her up with a piece of wire. *Id*. After taking a bag of money and the change drawer, both left the store and were driven away by Carter's brother, Troy. *Id*. All three were later apprehended, and at trial, prior to the testimony of co-defendant Troy, Duckworth moved for a severance, but the motion was denied. *Id*. Troy testified about dropping his brother and Duckworth off at the grocery store and waiting for them. *Id*. He also identified pictures taken when they were stopped by police, showing the money bag and change drawer in the interior of his vehicle. *Id* at 937. On appeal of his conviction, Duckworth argued that he had a right to a severance. *Id*. However, the Mississippi Supreme Court disagreed and held that whether a severance

16

is granted is within "the sound discretion of the trial judge." *Id*. The Court stated that Troy Carter's testimony did not tend to exculpate himself at the expense of his brother or Duckworth, nor did there appear to be a conflict of interest among the co-defendants. *Id*. Accordingly, the court found no abuse of the trial court's discretion in denying the motion to sever. *Id*.

¶35. More recently, in *Pope*, J'Var Pope and Robert Hart were charged with capital murder, aggravated assault and armed robbery for allegedly killing Jerry Lee Lewis, and shooting Eugene Weathersby and Mitchell Weathersby while attempting to rob these men. *Pope*, 330 So. 3d at 416 (¶10). When arrested, Hart was wearing a Mississippi Department of Corrections ankle monitor. *Id*. at 416 (¶8). After his conviction, Pope appealed the trial court's denial of his motion to sever. *Id*. at 424 (¶67). This Court cited the factors to be analyzed when considering a severance motion, *see above*, and noted that "[t]he denial of a severance only becomes error when the defenses of the co-defendants are adverse to one another." *Id*. at (¶66) (citing *Rigby v. State*, 485 So. 2d 1060, 1061 (Miss. 1986)). Pope argued that he was prejudiced by testimony from a witness, Bowie, who stated that the day before the crime, he had spoken to both Pope and Hart. *Id*. at (¶67). Bowie testified that Hart had told him of his plans to commit a robbery, and although Hart did most of the talking, Pope was present and said he knew where to get a gun. *Id*. In finding no merit to Pope's severance argument, we stated, "[L]ooking at Bowie's testimony[,] Hart's statements did not exonerate him, at all, much less at the expense of inculpating Pope. Rather, the

17

statements inculpate Hart and Pope equally." *Id*. at (¶68). Pope also pointed to the evidence about Hart's GPS monitor, but we held that this evidence did not tend to exculpate Hart at Pope's expense either. *Id*. at (¶69).

¶36. In this case, Harris claimed that there were pre-trial statements given that exculpated Hibbler or Ladd and inculpated Harris. However, Hibbler never gave a statement to law enforcement during the investigation of the case at all. Although Ladd did, the State assured the court that it did not intend to use any pre-trial statement and further agreed to sever Ladd's case. Harris also gave a statement which the State characterized as being "couched on an alibi and hearsay information of who may have committed the acts."[4] Harris's statement then did not inculpate the co-defendants at the expense of one over the other. The defenses of both Harris and Hibbler remained the same: a denial of guilt for the crime. At trial, neither defendant testified or introduced any evidence that would place more blame on one defendant than the other. Rather, the proof showed that both Harris and Hibbler shot in the direction of Vardaman, only to strike Pige instead.

¶37. Harris and Hibbler each presented a similar defense and trial strategy. They cross-examined witnesses, attacking their credibility and ability to recall facts. They noted deficiencies in the police investigation, for example, the failure to perform a gun residue test on either defendant. Neither presented any testimony to undermine the defense of the other,

---

[4] Harris's statement does not appear in the record, although the State included its impression of its contents in its response to Harris's motion to sever.

nor was there any inconsistency between their respective defenses. Accordingly, because there was no testimony, either direct or through the introduction of a statement, by which it could be said that Hibbler sought to exculpate himself at Harris's expense, and because the evidence did not show more guilt as to one than the other, Harris failed to present evidence to warrant a severance. Accordingly, we find no abuse of discretion by the circuit court in denying Harris's motion to sever.

**II.     Whether the verdict is against the overwhelming weight of the evidence.**

¶38.     Harris next contends that the jury's verdict was contrary to the overwhelming weight of the evidence, warranting reversal. In *Mayfield v. State*, 422 So. 3d 956, 961 (¶16) (Miss. 2025), the Mississippi Supreme Court succinctly summarized the principles for us to follow in our analysis of Harris's claim.

> When reviewing a claim that the verdict was against the overwhelming weight of the evidence, this Court should "view the evidence in the light most favorable to the verdict[.]" *Little v. State*, 233 So. 3d 288, 289 (Miss. 2017). The Court should not disturb the jury's verdict unless "it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* On review, the Court should not reweigh the evidence, assess witness credibility, or resolve conflicting evidence as these are the jury's responsibilities. *Id.* This Court has previously held that "[t]he jury determines the weight and credibility to give witness testimony and other evidence." *Moore* [*v. State*], 933 So. 2d [910,] 922 [(Miss. 2006)] (citing *Johnson v. State*, 904 So. 2d 162, 167 (Miss. 2005)). If the evidence justifies a verdict, we must accept it "as having been found worthy of belief." *Id.* (internal quotation mark omitted) (quoting *Davis v. State*, 568 So. 2d 277, 281 (Miss. 1990)).

¶39.     Harris and the State both identify testimony in the record to support their positions of

either guilt or innocence. Harris points out that only one of the three eyewitnesses, Conley, could identify him without assistance (e.g., Stevenson admitted he had seen Harris and Hibbler's photographs on the sheriff's website prior to picking them out of the photo line-up). But in *Price v. State*, 361 So. 3d 105, 116 (¶43) (Miss. Ct. App. 2022), we upheld a jury's verdict with only one witness identifying the shooter. Moreover, at trial, Stevenson testified that he could identify Harris regardless of whether he had seen the website photos. Harris argues that Conley knocked Stevenson down in the melee that followed the initial shots, so Stevenson could not see what was happening. But as the State points out, this was for merely two or three seconds. "Unless testimony necessary to support the jury's verdict is so implausible or so substantially impeached as to be unworthy of belief, the jury's decisions in such matters is beyond the authority of a reviewing court to disturb." *Id*. at 117 (¶43). The three eyewitnesses' testimony in this case was not implausible or substantially impeached in this manner.

¶40. Harris further argues that there was no gun residue evidence entered. However, "the absence of physical evidence does not negate a conviction where there is testimonial evidence." *Pritchett v. State*, 134 So. 3d 857, 861 (¶13) (Miss. Ct. App. 2014). Harris also contends that there was no proof of a conspiracy or that Harris and Hibbler planned the shooting. However, the proof showed that Harris and Hibbler acted together in shooting at Vardaman. Jackson and Stevenson testified that they saw Harris pass the gun to Hibbler, and both fled the scene together. It was uncontested that both Harris and Hibbler shot in

20

Vardaman's direction and that some bullet from the combined shooting killed Pige. Considering all the evidence, and keeping in mind the province of the jury and the limits of our review, we cannot say that allowing the jury's verdict to stand would be sanctioning an unconscionable injustice. Accordingly, we find no merit to this issue.

### III. Whether the prosecutor's comments in closing arguments constituted misconduct that created unjust prejudice against Harris.

¶41. Harris next argues that comments made by the prosecutor during closing arguments were so prejudicial that his conviction should be overturned. In response, the State first contends that Harris waived this issue by failing to object when the comments were made. Notwithstanding this waiver, the State contends that the prosecutor's comments were not so inflammatory as to be improper or prejudicial.

¶42. "Traditionally, attorneys are given wide latitude in closing arguments." *Forbes v. State*, 771 So. 2d 942, 950 (¶23) (Miss. Ct. App. 2000). A party who fails to make a contemporaneous objection is procedurally barred from raising prosecutorial misconduct on appeal unless he can show plain error. *Spiers v. State*, 361 So. 3d 643, 662 (¶69) (Miss. 2023). Plain error, when applied to closing arguments, occurs "when the substance of the statement is 'out of bounds for closing arguments.'" *Id*. at (¶70) (quoting *Boyd v. State*, 977 So. 2d 329, 337 (Miss. 2008)). "To determine whether the statement was out of bounds, we must find that the 'prosecutor's statement was so inflammatory that the trial judge should have objected on his own motion.'" *Id*. (quoting *Ambrose v. State*, 254 So. 3d 77, 130 (¶167)

21

(Miss. 2018)). "Given the latitude afforded an attorney during closing argument, any allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety." *Rodriguez v. State*, 413 So. 3d 646, 656 (¶31) (Miss. Ct. App. 2025) (quoting *Ballenger v. State*, 667 So. 2d 1242, 1270 (Miss. 1995) (quoting *Ahmad v. State*, 603 So. 2d 843, 846 (Miss. 1992))).

¶43.    In the case at hand, Harris challenges statements made by the prosecutor in closing argument. Anticipating that the defense attorney would argue that the eyewitnesses could not recollect details, such as Conley's failure to remember what side of the street cars were parked on, the prosecutor stated:

> Does that matter? Seriously, does that matter? This lady is leaving church worshipping and loses her life. I said to you that's not the conduct [street shootings] that should be allowed in Tunica County. That's not appropriate. No matter what anybody tells you; there is a lot going on here.

The prosecutor ended by stating:

> I said this, and I will say it again, I don't apologize for being passionate about this case. And I never will. This is senseless. This is conduct that should not be tolerated. These defendants deserve to be found guilty.

However, Harris did not object to either statement; thus his claim of prosecutorial misconduct is procedurally barred.

¶44.    To get around this bar, Harris argues that the prosecutor's comments amounted to improper "send-a-message" comments that constituted plain error because they were so inflammatory that the court should have objected on its own. "A 'send-the-message' argument is one that encourages juries to use their verdict to 'send a message' to the public or to other

22

potential criminals, instead of rendering a verdict based solely on the evidence introduced at the trial of that case." *Porter v. State*, 418 So. 3d 1287, 1311 (¶72) (Miss. Ct. App. 2025). For example, in *Forbes*, 771 So. 2d at 950 (¶27), we held that it was error to urge jurors to consider that "the verdict you return is going to be reflective of the conscience of this community." However, in this case, the prosecutor's comments were not urging the jury to send a message to anyone. The prosecutor was not asking the jury to speak for the community, or to other criminals, nor was he asking the jury to disregard the evidence to uphold a community value. The prosecutor merely voiced, based on the facts of the case, what conduct should and should not be allowed under the law.

¶45. In addition, the "test for determining [whether an] improper argument by the prosecutor to the jury requires reversal is[] whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Davis v. State*, 660 So. 2d 1228, 1248 (Miss. 1995). Harris has presented no evidence or credible argument concerning how these comments prejudiced the jury. In fact, the jury's note during deliberations indicated that they had all agreed on the issue of guilt and were only divided on the extent of his sentence. Accordingly, we find no merit to Harris's claim that prosecutorial misconduct based on these comments warranted reversal.

IV.     **Whether jurors' withholding information during voir dire constituted juror misconduct warranting reversal.**

¶46. Harris argues that two jurors failed to answer unambiguous questions during voir

23

dire,[5] including if anyone knew any party involved or knew any facts about the case, when, in fact, they had significant connections to the victim and the victim's family. According to Harris, these two jurors, Juror 10 and Juror 2, should have disclosed their connections, and their failure to do so prejudiced the outcome, warranting reversal.

¶47. Harris raised juror misconduct in his motion for JNOV and attached copies of several Facebook posts to support his claims. These posts included a statement by Pige's mother about missing her daughter and photographs of other events, including unidentified persons. No affidavits were attached to the motion to authenticate the attachments or explain the posts' meaning or significance. The circuit court found that Harris had provided insufficient evidence of any alleged jury misconduct. In essence, the circuit court found that Harris's jury was fair and impartial, a ruling that on appeal we will only disturb unless it appears from the record that the court was clearly wrong. *Watts v. State*, 350 So. 3d 613, 618 (¶19) (Miss. 2022).

¶48. Harris argues that the juror misconduct here consisted of these two jurors allegedly failing to answer questions during voir dire. This Court has developed the following test when faced with post-trial claims of juror misconduct stemming from non-responsiveness during voir dire:

> [T]he trial court should, upon motion for a new trial, determine whether the
> question propounded to the juror was (1) relevant to the voir dire examination;

---

[5] In his motion for JNOV, Harris alleged misconduct by three jurors, including Juror 4. On appeal, Harris does not include Juror 4 in his argument.

(2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered. It is, of course, a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong.

*Id*. at (¶20).

¶49.  In this case, the court asked the venire:

Is anyone related by blood or marriage to Dontarrius Hibbler and Anfernee Harris, Little Mack, Thiro, Hibbler DT or Sky, Skyeesha Pige?

Juror 24 on the venire was the only person to respond concerning her relationship with Pige. She told the court that she was Pige's cousin, but she said she could still be fair. The court refused to strike Juror 24 for cause, and Harris used one of his preemptory strikes to strike her. In his JNOV motion, Harris claimed that two other jurors failed to respond to this question: Juror 10, whose nieces attended court every day and sat with the victim's sisters, and Juror 2, who failed to disclose that her cousin Tyrone was in a personal relationship with one of the victim's sisters. Harris claims their failure to respond constituted juror misconduct. However, looking at the first prong of the misconduct test, the court's question clearly and unambiguously asked for any relations "by blood or marriage" to Skyeesha Pige. Neither Jurors 10 or 2 had such a relation. So while they may have had other connections with Pige that could have been disclosed in response to different question, neither failed to answer the question posed by the court.

25

¶50. Moreover, the transcript reveals that no one asked the venire if they had any other contacts or connections to the victim. There was no question asked that would have required Juror 10 to disclose that his nieces were apparently friends with Pige's sister, or that would have elicited Juror 2's information that her cousin had a relationship with one of the victim's sisters. The only "catch all" question came from the court when it asked,

> Does anyone who have [sic] not already spoken have a reason why they cannot serve as fair and impartial juror in this case?

However, this question left it to the jurors to assess their own information and determine if they should or should not serve. Jurors 10 and 2 had no obligation to respond unless they felt they could not be fair and impartial.

¶51. Accordingly, because there was no question asked that Jurors 10 and 2 failed to respond to, Harris cannot establish the first element of juror misconduct, the failure by a juror with substantial knowledge to respond to an unambiguous question. Accordingly, we find no merit to the issue of juror misconduct.

**V.  Whether the jury improperly sentenced Harris to life imprisonment, i.e., whether the court erred in sentencing Harris without a sentencing hearing.**

¶52. Harris asserts that he was entitled by statute to a separate sentencing hearing before being sentenced to life in prison. Thus, because the jury was given the option of finding him guilty and fixing the penalty at life imprisonment in the guilt stage of his trial, his life sentence was improperly imposed.

¶53. Harris was charged and tried for the second-degree murder of Pige in violation of

26

Mississippi Code Annotated section 97-3-19(1)(b) (Rev. 2020), which provides as follows:

> (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
>
> . . . .
>
> (b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual, shall be second-degree murder[.]

Mississippi Code Annotated section 97-3-21(1)(b) (Rev. 2020) sets out the punishment for defendants found guilty of second-degree murder:

> (1) Except as otherwise provided for a juvenile offender in subsection (2) of this section, every person who is:
>
> . . . .
>
> (b) Convicted of second-degree murder shall be imprisoned for life in the custody of the Department of Corrections if the punishment is so fixed by the jury in its verdict after a separate sentencing proceeding. If the jury fails to agree on fixing the penalty at imprisonment for life, the court shall fix the penalty at not less than twenty (20) nor more than forty (40) years in the custody of the Department of Corrections.

¶54. In this case, the court's instruction concerning the verdict gave the jury three options: finding Harris not guilty, finding Harris guilty and fixing his punishment at life in prison, or finding Harris guilty but being unable to fix his punishment at life in prison. The instruction was proposed by the State, and given without objection by Harris. During deliberations, the jury posed a question, "If jury can't decide on life, does the judge decide the number of years of the sentence?" The court told the jury it could give them no further instructions. The jury

27

resumed deliberations and found Harris guilty of second-degree murder, fixing the penalty at life in prison. The jury was polled and all agreed to the verdict.

¶55. After the verdict and the dismissal of the jury, the record reflects that the court and counsel conferred about "a sentencing hearing." Hibbler's attorney questioned the court's sentencing authority and "further discussion ensued." Although we asked for the transcript of that discussion, the court indicated that it was off the record. Therefore, we do not know if, after the fact, either defendant's attorney objected to the sentence. However, we do know that Harris's attorney did not raise the form of the verdict instruction or challenge being sentenced to life imprisonment without a separate hearing in his JNOV motion. In *Fulks v. State*, 944 So. 2d 79, 85 (¶14) (Miss. Ct. App. 2006) (citing *Peterson v. State*, 740 So. 2d 940, 949 (¶30) (Miss. Ct. App. 1999)), we held that "objections to [a] sentence cannot be made initially on appeal." Because Harris did not object to the instruction or challenge the validity or constitutionality of his sentence to the circuit court below, we find that Harris is procedurally barred from raising those issues on appeal.

**VI.    Whether the court erred in summarily denying Harris's motion for JNOV.**

¶56. Harris finally claims that the circuit court erred by not conducting further investigation into his juror misconduct claims and holding a hearing. "We review the trial court's decisions concerning jury influence for an abuse of discretion." *Grimes v. State*, 361 So. 3d 179, 189 (¶24) (Miss. Ct. App. 2023).

¶57. When a defendant raises allegations of juror misconduct, "[t]he trial court first

28

determines whether an investigation is warranted." *Murry v. State*, 218 So. 3d. 303, 307 (¶17) (Miss. Ct. App. 2017). In cases where there is a claim of external influence, "[a]n investigation is warranted if the trial judge finds that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information." *Id.* (internal quotation marks omitted). "The trial court's inquiry stops if it finds no threshold showing of external influence." *Id.*

¶58.    "In order for the duty to investigate to arise, the party contending there is misconduct must make an adequate showing to overcome the presumption . . . of jury impartiality." *Grimes*, 361 So. 3d at 189 (¶25) (citing *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407, 418-19 (Miss. 1993)). "Although a minimal standard of a good cause showing of specific instances of misconduct is acceptable, the preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred." *Id.*

¶59.    Harris argues that he attached documents to his JNOV motion to substantiate his claims of jurors failing to disclose information to the court. However, as previously noted, the undated Facebook pages merely show photographs and a comment to a post by the victim's mother. Harris provided no affidavits to authenticate the materials or explain the meaning or significance of the Facebook postings. Merely alleging information about the two jurors does not establish that the allegations are true in fact. "Statements by attorneys are not evidence." *Wackenhut Corp. v. Fortune*, 87 So. 3d 1083, 1092 (¶27) (Miss. Ct. App. 2012). Moreover, Harris provided no evidence that these jurors were biased or did not act

fairly and impartially. Thus, we find no error in the circuit court's summary dismissal of Harris's motion for JNOV since there was no showing of a need for a hearing on the issues of juror misconduct.

## Conclusion

¶60. Finding no merit to any issue that is not procedurally barred, we affirm the jury's verdict of guilty and the sentence of life imprisonment imposed by the court.

¶61. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**